NATIONAL ASSOCIATION OF NEIGHBORHOOD HEALTH CENTERS, INC., Appellant,

v.

David MATHEWS, as U. S. Secretary of Health, Education and Welfare, et al., Appellees.

No. 76–1434.

United States Court of Appeals, District of Columbia Circuit.

Argued 15 Sept. 1976.

Decided 23 Nov. 1976.

Rehearing Denied Dec. 16, 1976.

---

Marilyn G. Rose, Washington, D.C., with whom Joseph N. Onek, Washington, D.C., was on the brief for appellant.

Richard A. Graham, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Asst. U. S. Atty. and Mary F. Wieseman, Atty., Counsel, Dept. of Health, Education and Welfare, Washington, D.C., for appellees.

Before TAMM, MacKINNON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

On cross motions for summary judgment filed in the court below, the U. S. District Court found[1] that the Department of

1. Court's Finding of Fact and Conclusions of Law (Transcript of Proceedings 2–3), Joint Appendix (J.A.) at 54–55.

Health, Education and Welfare had administered the Hill-Burton Act [2] in violation of separate provisions that were added by amendment in 1970.[3] The first violation was that HEW had approved transfers by states of monies from the outpatient category to the hospital and public health category, beyond the limitations of the Act.[4] The second violation was that HEW had dispensed monies for the construction of outpatient facilities [5] without according "special consideration" to rural and urban poverty areas, as required by the Act.[6] Shortly after these findings and the accompanying order were issued in written form,[7] HEW promulgated a remedial plan.[8]

Plaintiff-appellant, the National Association of Neighborhood Health Centers, Inc. (NANHC) challenged both the court order and the HEW plan as not affording the full relief to which it was entitled. The District Court denied its objection, and this appeal ensued. HEW does not dispute the decisions of the District Court and argues rather that the relief already provided should not be enlarged. For the reasons set out more fully below, this court affirms the trial court in most respects, particularly as to the underlying conclusions of law, but does remand for further proceedings with regard to two of the terms of relief.

**2.** Title VI of the Public Health Service Act, 42 U.S.C. § 291 *et seq.*, (commonly referred to as the Hill-Burton Act).

**3.** Pub.L.No.91–296, 84 Stat. 337.

**4.** 42 U.S.C. § 291b(e)(1) and (2).

**5.** An "outpatient facility" generally means "a facility . . . for the diagnosis or diagnosis and treatment of ambulatory patients." It may be "located [either] in or apart from a hospital." 42 U.S.C. § 291o(f).

**6.** 42 U.S.C. § 291c(a)(4).

**7.** Findings of Fact, Conclusions of Law and Order of 2 April 1976. J.A. 56–64.

**8.** 41 Fed.Reg. 16194 (1976).

**9.** Pub.L.No.79–725, 60 Stat. 1041.

**10.** After the 1970 amendments, the following categories were authorized: (1) long-term care facilities; (2) outpatient facilities; (3) rehabilitation facilities; (4) hospitals and public health

## I. THE BACKGROUND OF THIS APPEAL

### A. *Statutory and Regulatory Setting*

Originally enacted in 1946, the Hill-Burton Act (hereafter "the Act") [9] is a federal-state program which authorizes federal financial assistance for the construction and modernization of hospitals and other medical facilities. The Act initially funded two categories of medical facilities—hospitals and public health centers—but has since been amended to include others; [10] Congress has authorized money to be appropriated separately for each category.[11] For a state to participate in the program, it must develop a plan that will seek to construct and modernize medical facilities, on the basis of a state survey of need, so as to provide adequate facilities for all residents of the state.[12] The Act directs HEW to issue "general" regulations for the states regarding their determinations of need, their priority of projects and other elements of their plans.[13] HEW approves any plan that complies with the Act.[14]

Money is allotted to the states in accordance with a formula in the Act, with each allotment in turn divided into the separate categories specifically funded by Congress.[15] A particular project that seeks federal

centers, and (5) modernization of existing facilities. 42 U.S.C. § 291a.

**11.** 42 U.S.C. § 291a.

**12.** 42 U.S.C. § 291d.

**13.** 42 U.S.C. § 291c.

**14.** 42 U.S.C. § 291d(b).

**15.** 42 U.S.C. § 291b. Imagine, for example, that a state were allotted $100 as its Hill-Burton total, as determined by the formula for allotment among the states, *ibid.* That money would then be divided up into the various categories, see n. 10, *supra*, in the same percentages as Congress divided up its total appropriation among the categories. Thus, if Congress, for instance, devoted 35% of its total appropriation to the outpatient category, our hypothetical state would be entitled to $35 for its outpatient facilities. But see the transfer provisions of the Act, 42 U.S.C. § 291b(e), discussed *infra*.

funds will apply to HEW through the state agency. If the state agency approves the application, and if it otherwise complies with the Act and the state plan, HEW. is directed to approve it, provided, of course, sufficient funds are available from the state allotment to pay the federal share.[16]

In 1970 [17] Congress added clause "(4)" to section 603(a) of the Hill-Burton Act so that it read, in pertinent part as follows:

The Surgeon General,[18] with the approval of the Federal Hospital Council and the Secretary of Health, Education, and Welfare, shall by general regulations prescribe—

(a) the general manner in which the State agency shall determine the priority of projects based on the relative need of different areas lacking adequate facilities of various types for which assistance is available under this part, giving special consideration—

(4) in the case of projects for construction or modernization of outpatient facilities, to any outpatient facility that will be located in, and provide services for residents of, an area determined by the Secretary to be a rural or urban poverty area.[19]

The 1970 amendments to the Hill-Burton Act also changed the provisions available to the states for making transfers of money between categories. They allowed any state in its own discretion to transfer a certain minimum amount—$200,000 in the case of outpatient grants—to any other category.[20] They did not allow transfers above that amount to be made from the outpatient category to the hospital category, although they did allow transfers above that amount from outpatient to other categories. Such a transfer from the outpatient category would only be permitted if the state certified that, "it has afforded a reasonable opportunity to make applications for the portion so specified and there have been no approvable applications for such portion." [21] In addition, the 1970 amendments would allow a transfer to the hospital category from the modernization category if the state certifies that the need for new hospitals and public health centers is substantially greater than the need for modernization of existing facilities.[22] The 1970 amendments also substituted the term "outpatient facility" for "diagnostic or treatment centers," and expanded the eligibility for federal funds to include privately-owned outpatient facilities which would be located apart from hospitals.[23]

On 6 January 1972 HEW issued its final regulations implementing the 1970 amendments.[24] These regulations defined the term "outpatient facility" [25] and set standards for determining the need for and the distribution of outpatient facilities.[26] HEW

16. 42 U.S.C. § 291e.

17. *Supra* n. 3.

18. This function is now performed by the Secretary of Health, Education and Welfare. *See* Reorganization Plan No. 3 of 1966, 31 Fed.Reg. 8855 (1966).

19. 42 U.S.C. § 291c.

20. 42 U.S.C. § 291b(e)(1).

21. 42 U.S.C. § 291b(e)(2).

22. 42 U.S.C. § 291b(e)(3).

23. 42 U.S.C. § 291e(e). In other words, applicants for Hill-Burton funding of outpatient facilities prior to the 1970 amendments had to be either "(1) a State, political subdivision, or public agency, or (2) a corporation or association which owns and operates a nonprofit hospital," *ibid.*

24. 37 Fed.Reg. 182 (1972) 42 C.F.R. Part 53. Proposed regulations had been issued at 36 Fed.Reg. 14016 (29 July 1971).

25. 42 C.F.R. § 53.1(j).

26. § 53.51 State need (standards of adequacy).
Outpatient facilities shall be planned in sufficient number to make at least the basic minimum services readily available to all persons in the State. Provision of the basic minimum services requires facilities for examination of patients by a physician or a dentist, and the provision of clinical laboratory and diagnostic X-ray services.
§ 53.52 Distribution (service areas).
In determining the need for additional outpatient facilities in an area as a basis for distribution of such facilities, special consideration shall be given to areas in which there is a shortage of services provided by private physicians and dentists. Outpatient facilities

also directed the states to determine the priority of projects based on the relative need of the service areas, according "special consideration" to outpatient facilities in poverty areas.[27] Finally, the regulations set forth the criteria HEW will employ in designating rural or urban poverty areas,[28] a duty assigned by the statute to HEW in the first instance. An area is to be designated a "poverty" area if its median family income falls below the 20th percentile of the median family income of the state, but

the state is vested with substantial discretion in structuring the "areas," e. g., in targeting "subareas of extreme poverty."

### B. Litigation History

The National Association of Neighborhood Health Centers, Inc. (NANHC) is a nationwide organization of community health centers which "provide or seek to provide outpatient health services in urban and rural poverty areas."[29] Along with four other plaintiffs, who are no longer

> should be planned in the same service areas used for planning hospitals except that more than one outpatient facility service area may be planned in such hospital service area, resulting in a subdivision of the hospital service area into a number of outpatient facility service areas.
>
> § 53.53 Existing outpatient facilities.
>
> (a) The count of existing outpatient facilities shall exclude:
>
> (1) Offices of private physicians and dentists, whether for individual or group practice;
>
> (2) Industrial clinics for employees only, first aid clinics, and similar facilities not furnishing a community service.
>
> (b) Existing outpatient facilities shall be classified as conforming or nonconforming according to plant evaluation standards as set forth in Subpart E of this part.

**27.** 42 C.F.R. § 53.84. These regulations essentially paraphrase or repeat the language of 42 U.S.C. § 291c, quoted *supra*.

**28.** 53.129 Determination of rural or urban poverty areas.

> For purposes of determining the priority of projects for construction or modernization of outpatient facilities pursuant to section 603(a)(4) of the Act and of establishing a Federal share of any project (not to exceed 90 per centum of the cost of construction) pursuant to section 645(b)(4) of the Act, the State plan shall include a designation of areas in the State which are proposed by the State agency, in accordance with this section, to be rural or urban poverty areas. For purposes of this section, "area" means a service area (or the nearest approximation thereto for which current census data are available, based on geographic boundaries such as counties or census tracts) or a subservice area which is designated in the State plan as providing the basis for the provision of outpatient services.
>
> (a) The Secretary will determine to be a rural or urban poverty area any area which has been found by the State agency, on the basis of the latest available published data from the Bureau of the Census, to be an area

> in which the median annual family income ranks in or below the 20th percentile of the median annual family income ranks in the State.
>
> (b) The Secretary may determine to be a rural or urban poverty area any area which
>
> (1) has been found by the State agency to be an area in which median family income ranks above the 20th percentile of the median family incomes for all areas in the State but in or below the 30th percentile of the median family incomes for all areas in the State;
>
> (2) has been designated by the State agency as a rural or urban poverty area, and
>
> (3) has been determined by the Secretary, on the basis of information set forth in the State plan, to have special characteristics related to poverty which are not adequately reflected in its median family income percentile rank, such as (i) subareas of extreme poverty or (ii) high costs of obtaining hospital services when compared to other areas in the State.
>
> (c) The Secretary may also determine to be a rural or urban poverty area any area in which, on the basis of the latest available published data from the Bureau of the Census, the median family income ranks above the 30th percentile of median family incomes for all areas in the State but with respect to which the State agency demonstrates to the satisfaction of the Secretary that the income level of families in such area has changed sufficiently since the date of such latest available published data to justify classification of the area as a rural or urban poverty area under the criteria set forth in paragraph (a) or (b) of this section.
>
> (d) The State agency shall reevaluate its designation of proposed rural or urban poverty areas every 2 years, and will make such revisions in such designation as it finds necessary in accordance with the provisions of this section.

**29.** Amended Complaint, Para. 3(a); J.A. 18.

parties to this litigation,[30] NANHC brought suit in January 1974 against the Secretary of the U. S. Department of Health, Education and Welfare and the Director of the Health Facilities Construction Service, which is within the Department (hereafter jointly referred to as "HEW"). The complaint charged HEW with illegally impounding funds and with otherwise violating the Hill-Burton Act.

In June 1974 the court found that the issue of impoundment was mooted,[31] as HEW had allocated the funds in February 1974. Both sides then conducted discovery and brought motions for summary judgment and to dismiss, which were argued in October 1975. The District Court dismissed the remaining claims against HEW on the grounds that the remaining plaintiffs lacked standing under the principles of the then recent case of *Warth v. Seldin*.[32] In December 1975 this court granted summary reversal, as to NANHC, but not as to the other parties.[33]

Upon remand, the District Court held orally in January 1976 that HEW had violated the "transfer" and "special consideration" provisions of the Act. As noted, his full, written opinion was issued in April 1976, after proposed findings of fact and law and proposed orders had been submitted by both sides for his consideration. Both sides filed motions for amended orders. HEW published a remedial plan within two weeks of the opinion.[34] NANHC then filed a motion in opposition to the HEW plan and the HEW motion to amend. In May 1976 the District Court modified his order in one respect but otherwise denied all the motions.

NANHC takes this appeal from the denial of its motions, arguing that the court order and the HEW plan do not provide all the relief to which it is entitled. Before turning in Parts III and IV to a full statement of the issues presented on review and our analysis of their disposition, it is necessary to decide once again the question of standing for NANHC.

## II. THE STANDING OF NANHC

Upon prior consideration of the standing issue, a motions division of this court concluded that the required injury to NANHC had been adequately alleged.[35] Indeed, in its subsequent opinion, the District Court found that NANHC had showed that one applicant for outpatient funds (the Beaufort-Jasper Center in South Carolina) which was located in a designated poverty area had been denied "special consideration."[36] HEW asks this court to reconsider our earlier decision because, "the subsequent refusal of the Beaufort-Jasper Center to accept funding has undercut appellant's claim of injury in fact as a representative of its members and has thus mooted appellant's claim of standing."[37] We need not decide the debatable question[38] of whether the refusal here moots standing, because it appears from the record that other members of NANHC have adequately shown the required injury to sustain its standing.

30. Two of the plaintiffs voluntarily withdrew prior to the decision of the District Court on standing. The two others were dismissed by the District Court and not reinstated by the Court of Appeals. See text at notes 32–33.

31. Order and Partial Summary Judgment, J.A. 33–36.

32. 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Order of 28 October 1975.

33. *National Association of Neighborhood Health Centers, Inc. v. Weinberger*, No. 75–2106 (D.C.Cir., 5 December 1975).

34. *Supra*, n. 8.

35. *Supra*, n. 33.

36. Findings of Fact, Conclusions of Law and Order, Para. 8, J.A. 61.

37. Brief for Appellees at 25.

38. Appellees have filed, 30 July 1976, copies of several documents relating to this offer of Hill-Burton funding. Beaufort-Jasper appears to have declined it due to its determination of the difficulty in complying with the "time frame" of the application. See attachment No. 3. Counsel disagree as to the interpretation to be put on the entire transaction.

For an organization to have standing under § 10 of the APA [39] it must establish, in the absence of any cognizable injury to itself, that there was "actual injury to any of their . . . members," *Simon v. Eastern Kentucky Welfare Rights Organization.*[40] The record in this case indicates that one of the NANHC members, the Franklin Fetter Center, which had inquired about outpatient funding, was told that Charleston County, where it was located, was not "considered a poverty area," [41] thus disadvantaging Franklin Fetter in the priority of Hill-Burton funding. As will be more fully explained in Part IV, NANHC challenges the HEW administration of the "poverty area" designations as contrary to the Act, *e. g.,* by its approval of designations drawn "on the basis of large political lines (usually counties) without regard to lines more related to the delivery of primary health care services." [42]

Thus, HEW begs the question when it contends that "[T]hese centers [*e. g.,* Franklin Fetter] have demonstrated and can demonstrate no injury in fact as the direct result of the challenged policies, since they are not located in designated poverty area

and never actually made application for funds." [43] HEW's contention assumes, of course, that the designations were proper and legal, one of the central issues in dispute. NANHC may not prevail on the merits of its claim, but it has established sufficient injury under the APA [44] to contest the HEW administration of the "special consideration" requirement.

In addition, however, *Simon v. Eastern Kentucky Welfare Rights Organization* [45] reminds us that the "necessity that the plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an Art. III requirement." Thus, in order to avoid an advisory opinion, the plaintiff must show "an injury to himself that is likely to be redressed by a favorable decision." [46] The *Simon* Court denied standing to parties who had "suffered injury" because it was only "speculative" whether a court remedy would result in relief for their injury.[47] Here, in contrast, the probability of relief due to court intervention is much greater. HEW regulations, which are subject here to court review and court order, provide the guidelines for the creation of state plans, which HEW must

---

**39.** "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

**40.** 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976).

**41.** Letter from South Carolina Department of Health and Environmental Control, J.A. 230–31. *See also* Affidavit of Leroy Anderson, Project Director for Franklin Fetter, J.A. 216–20.

**42.** Appellant's Brief at 28.

**43.** Appellee's Brief at 24.

**44.** Not only can NANHC show that one of its members is among the injured, *compare Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), but its injury is "arguably within the zone of interests to be protected . . . by the statute," *Data Processing Service v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Franklin Fetter is a possible beneficiary of a federal program aimed at the construction of medical facilities and seeks to furnish adequate medical services to

all people, another goal of the Act. *See* Congressional Declaration of Purpose, 42 U.S.C. § 291.

**45.** *Simon, supra* at 39, 96 S.Ct. at 1924.

**46.** *Ibid.*

**47.** The plaintiffs in *Simon* were indigents who were denied hospital services because of inability to pay. Along with organizations that represented them, they challenged an IRS Revenue Ruling, which changed the definition of a "charitable" hospital for purposes of nonprofit status, so as to allow a reduction in the extent of medical care available for indigents. Plaintiffs alleged that the adoption of this new Ruling had "encouraged" hospitals to deny service to indigents. The Court, however, believed it only "speculative" whether an invalidation of the Ruling would afford relief to the injury: "So far as the complaint sheds light, it is just as plausible that the hospitals to which respondents may apply for service would elect to forego favorable tax treatment to avoid the undetermined drain of an increase in the level of uncompensated services." *Simon, supra* at 43, 96 S.Ct. at 1926.

approve. Hill-Burton monies for particular projects are to be spent within the design of the state plans, again with HEW approval. It is thus not just speculation whether HEW could cure the injury to NANHC members; it is a sound likelihood.[48]

■ HEW also argues that NANHC lacks standing in this appeal to contest the scope of the illegal transfers: "Appellant makes no allegations that illegal transfer of funds affected any of its members (South Carolina was not accused of making illegal transfers)."[49] As will be more fully explained in Part III, NANHC objects to the failure of the District Court to order HEW to recover all money "indirectly" transferred by the states from the outpatient category to the hospital category. NANHC seeks in particular to have HEW recover more money from four states[50] which, NANHC contends, used "indirect" transfers taking longer than six months, the cutoff adopted by the District Court. In these four states, the record shows that NANHC has members seeking the funds that will be recovered by HEW.[51]

NANHC thus has standing, through these members, to dispute the validity of the six-month cutoff adopted by the District Court. The HEW Remedial Plan directs the restored funds to be transferred to the outpatient category.[52] The less that is recovered in the four disputed states, the less will be

available to the present applicants, including the NANHC members; these members are directly hurt by the court order, in the sharp curtailment of their opportunities for funding.[53] Conversely, under the *Simon* test for corrective relief, a court order for expanded recovery under HEW implementation, which is already in progress, would undoubtedly benefit NANHC members due to the larger pool for outpatient funding. While it is not certain that NANHC members would be funded due to the extra recovery from their claim here, it is probable that the prospect of funding, itself substantial relief, would be enhanced.[54]

### III. THE TRANSFER OF FUNDS

As detailed earlier,[55] the funds allocated under the Hill-Burton Act for the states are earmarked for specific categories of aid. Among the transfer provisions added by the 1970 amendments was a ban on the transfer by any state of funds in excess of $200,000 from the outpatient category to the category for hospitals and public health centers. Justifying this emphasis on outpatient construction was the following view of the Senate Committee:

As evidenced throughout the testimony, the committee concluded that legislation should be designed in such a way as to promote alternative means for the delivery of health care outside of the expen-

---

**48.** The capacity for HEW implementation of a court order has already been demonstrated, as noted, by the Remedial Plan it issued soon after the written opinion. As will be explained in Part IV, it imposes a number of specific, unequivocal standards on the states in order to correct past violations.

**49.** Appellees' Br. at 28. Appellees cannot contest standing for purposes of the relief already granted, as it has taken no appeal in this case. It may only dispute the standing of NANHC for purposes of the expanded relief it seeks.

**50.** Florida, Kansas, Mississippi, and Virginia. Appellant's Br. at 34.

**51.** The Family Health Center, Miami, Florida; Jackson-Hinds Comprehensive Health Center, Jackson, Mississippi; Delta Center, Mound Bayou, Mississippi. J.A. 207–08.

**52.** 41 Fed.Reg. at 16195.

**53.** In Mississippi, for instance, the District Court found illegal transfers of $461,638 for FY 1971 and $599,568 for FY 1972. J.A. 59. NANHC claims that without the allegedly wrongful use of the six-month cutoff for "indirect" transfers the proper recovery for FY 1971 should be $761,638 and for FY 1972 should be $1,049,568. Appellant's Br. at 34.

**54.** The calculation of probability must also take into account the other contention of NANHC, that "poverty area" designations have been wrongfully withheld from its members. If relief for that claim is also afforded, as is assumed under an analysis of standing, then NANHC members are even more likely to "profit," *Simon, supra* at 39, 96 S.Ct. at 1924, from an expanded recovery, given the "special consideration" mandated for poverty projects.

**55.** *Supra* at I.A.

sive acute inpatient setting, especially through the use of outpatient facilities.[56]

The transfer prohibition became effective 30 June 1970 by the terms of the 1970 amendments. The trial court found that for FY 1971 and FY 1972 HEW approved illegal transfer in a total of twelve states.[57] In five states funds in excess of $200,000 were directly transferred from the outpatient category to the hospital category, clearly in violation of the Act. In the remaining instances the District Court found that HEW violated the Act by permitting the states to engage in "indirect transfers [which] channell[ed] the excess funds through a category permitted by the statute to receive transfers in excess of $200,000 from the outpatient facilities category."[58] These indirect transfers were accomplished over varying periods of time, ranging from one day[59] to longer intervals. The figures adopted by the District Court as constituting the exact dollar amount of the illegal transfers included only the indirect transfers that had been accomplished "within a six month period."[60] NANHC contends that this six-month cutoff is unjustified and arbitrary. It seeks, in particular, to have HEW recover from four states[61] *all* the funds they are alleged to have indirectly transferred from the outpatient to hospital categories in FY 1971 and 1972.

The District Court gave no explicit explanation either for its finding of illegality in the indirect transfers or for its adoption of the six-month cutoff. On the face of the Act, there appears to be no proscription of indirect transfers in excess of $200,000: The Act does allow, with proper certification, additional outpatient money to be transferred to some other categories, like modernization, and the Act does allow, again with proper certification, a state to transfer modernization money to hospitals.[62] But underlying the District Court's finding is probably its judgment that this mechanism had been abused by states which wished to "accomplish indirectly a transfer which would be illegal if accomplished directly."[63] Thus, states which "merely passed [outpatient monies] through an intermediate category to the hospital and public health centers construction violated the act"[64] and were obliged to recover such misdirected money for outpatient use.

HEW has offered two explanations for the six-month cutoff in the figures adopted by the District Court. The first is that beyond six months, "it is not possible to trace funds from one category to another in all instances."[65] NANHC disputes this factual assumption very vigorously, offering with regard to all four states in question to prove how the outpatient money can be traced beyond the six months.[66] HEW has

---

**56.** S.Rep.No.657, 91st Cong., 2d Sess. (1970), 1970 U.S.Code Cong. & Adm.News 3332, 3342.

**57.** Findings of Fact, Conclusions of Law and Order, Para. 4, J.A. at 58–59.

**58.** *Ibid.*

**59.** On the same day, Kansas, with HEW approval, transferred $578,831 of outpatient monies to modernization and $578,831 of modernization monies to hospitals. Plaintiff's Statement of Material Facts Not in Dispute (Pl. Statement), J.A. 115.

**60.** The District Court adopted its figures, *in toto*, from Defendants' Proposed Findings of Fact, Conclusions of Law, J.A. 239–40. HEW stated therein that their figures were based on a six-month cutoff.

**61.** *Supra*, n. 50.

**62.** *See supra* text at notes 21–22.

**63.** Defendants' Proposed Findings, J.A. 239. This proposed language immediately preceded the figures for transfers adopted by the trial court and appears to be an apt explanation of why the indirect transfers were held illegal.

**64.** *Ibid.*

**65.** *Ibid.*

**66.** Appellant's Reply Br. at 12–14. For each state NANHC sets out the exact transfers that it proposes to trace. For example: "In the State of Mississippi, in May 1971 $300,000 of 1971 long-term care monies and $200,000 of 1971 outpatient monies were transferred into the hospital category. (J.A. 118.) In February 1972, another $793,839 of 1971 outpatient monies were transferred, $461,638 into the hospital category and $332,201 into the long-term

not offered any further substantiation of its assertion above, and has relied in this court upon another justification for the cutoff. Thus, it appears that there is a genuine issue of material fact about whether the outpatient funds can, in fact, be traced beyond six months. Depending on whether the second explanation supports the cutoff, it may be necessary to remand this issue to the District Court.

█ The second possible rationale for the cutoff rests upon a statutory interpretation. Pointing out correctly that the Act, on its face, does not prohibit indirect transfers, HEW argues that what Congress intended, rather, was to require states to undergo a "two-step procedure" that would "compel . . . a rigorous examination . . . of the existence of projects" before an indirect transfer from outpatient to hospital spending would be allowed.[67] In order to make the first transfer from outpatient funds, a state must certify that there remain no more approvable applications.[68] And to make the second transfer to hospitals, e. g., from modernization, that state must again certify, as to modernization funds, for instance, that the need for hospitals is substantially greater. It may well be, as HEW contends, that Congress did not mean the Act to establish a *per se* prohibition on indirect transfers but rather intended for the states, through the two-step procedure, "to consider alternative means of health care delivery before putting all of its funding into hospital construction."[69] On the basis of that reading, HEW might consider any indirect transfer taking longer than six months to be a "bona fide" trans-

action, as evidencing sufficient deliberation by the state to comply with the purpose of the Act.

This court need not decide whether the HEW position amounts to a reasonable interpretation of the Act because, in any event, such justification *for the cutoff* cannot apply to this case. The factual premise of a "bona fide" indirect transfer is that a state properly certified the first transfer, i. e., that there was no longer an "approvable" demand for outpatient funds. The 1970 amendments, for the first time, allowed non-public, non-hospital outpatient facilities to apply.[70] However, HEW did not change its regulations to accord with the new law until 1972; for FY 1971 and FY 1972, the prior regulations, promulgated in 1964,[71] were in effect. Thus, the state certificates were executed and outpatient money transferred even though a new class of applicants, including many members of NANHC, was illegally excluded from eligibility. Such error was further aggravated when the outpatient money was then transferred to hospitals, particularly given that an underlying purpose of the Act was to promote the use of outpatient facilities rather than the use of hospitals.[72]

This court does not hold that under no circumstances could indirect transfers ever be bona fide, for that would be to amend the Act. This court finds simply that under the wrongful regulatory setting of FY's 1971 and 1972, with the resultant infirm certificates, HEW's statutory justification for the six month cutoff cannot be accepted.[73] The District Court must determine,

---

care category. (J.A. 118.) As a result, $961,-638 of 1971 outpatient monies were transferred into the hospital category, $661,638 directly, and $300,000 indirectly." *Id.* at 12–13. NANHC seeks to add that $300,000 to the total of illegal indirect transfers.

67. Appellees' Br. at 50–51.

68. See text at n. 21, *supra.*

69. Appellees' Br. at 51.

70. *Supra* n. 23.

71. 29 Fed. Reg. 18447 (1964). § 53.1(g) of these regulations did ⌐ ¬† define "diagnostic or

treatment centers," since renamed "outpatient facilities," to include private, nonprofit centers apart from hospitals, the so-called "free-standing" clinics.

72. See text at n. 56, *supra.*

73. HEW has not brought to the attention of the court any transfers in FY 1973 or FY 1974 from the outpatient category. It thus appears that once the "freestanding" clinics became eligible under the 1972 HEW regulations the states no longer executed certificates that outpatient money could be transferred.

therefore, with regard to the four contested states, which outpatient monies can, in fact, be traced into the hospital category.[74] The HEW Remedial Plan indicates that it has begun action with respect to the transfer violations already found, thus establishing a mechanism for any further restoration of funds to the outpatient category.[75]

## IV. "SPECIAL CONSIDERATION" FOR POVERTY AREAS

Quoted in relevant part earlier,[76] the Hill-Burton Act directed HEW to prescribe by general regulations the manner in which states should determine the priority of applicants for federal funds. By the 1970 amendments to the Act, HEW was to provide regulations setting out how the states should give "special consideration," with regard to outpatient projects, to any facility "that will be located in, and provide services for residents of, an area determined by the Secretary to be a rural or urban poverty area."[77] In September 1971, as found by the District Court,[78] HEW sent all the states a memorandum which advised the states that they did not have to designate poverty areas at all, since the economic data from the 1970 census was not then available. In reliance on this memorandum, states, in fact, made grants of outpatient funds, which HEW approved, without regard to the poverty area priority. In 1972 HEW issued the regulations on "special consideration" for poverty areas.[79] The District Court found, however, that even after these regulations were issued, some states, with HEW approval, continued to make grants and transfers without amend-

ing their plans to designate poverty areas. HEW has submitted a Remedial Plan, which will be discussed in full below, which seeks to correct its violations of the Act.

In its opinion of April 1976 the District Court did not expressly discuss or determine whether the 1972 regulations properly implemented the 1970 amendments. NANHC moved to amend the District Court opinion to include findings that those HEW regulations were inadequate in certain particulars. The District Court denied the NANHC motion by order without opinion, also denying in the same order a motion that NANHC had submitted in opposition of the HEW Plan. Thus there is no express discussion either of whether the HEW Plan contains adequate measures to remedy the violations.

Upon a careful review of the record in this case, we conclude that the 1972 regulations and the HEW Plan should be sustained and, therefore, affirm the order of the District Court. The order will have to be amended on remand, however, to extend the period of time during which monies may be obligated. A detailed consideration of our disposition now follows.

### A. Service to Residents of Poverty Areas

■ The NANHC motion to amend the opinion of the District Court, which it denied, sought a conclusion of law that "projects eligible for special consideration under 42 U.S.C. § 291c(a)(4) must be designed to serve the populations of poverty area in which they are located and these populations are primarily the disadvan-

---

74. The inquiry remaining is whether the funds can, in fact, be traced, and not whether the states acted in good or bad faith in making the transfer. Thus the states will not necessarily have to be joined as parties. After all, the District Court was able to determine on summary judgment below the exact extent of the indirect transfers before the six month cutoff. The District Court could even direct HEW to conduct an accounting with regard to the remaining indirect transfers that cannot readily be traced.

75. The HEW Plan directs the states to restore the mistransferred money to its outpatient cat-

egory, where it is then available to applications by "freestanding" clinics, which were wrongfully excluded from eligibility in FY's 1971 and 1972.

76. Text at *supra* n.19.

77. 42 U.S.C. § 291c(a)(4).

78. Findings of Fact, Conclusions of Law, and Order, Para. 3, J.A. 60.

79. *Supra* n.24.

taged." [80] NANHC contends, in other words, that the Act imposes a duty on HEW not only to insure that "special consideration" is accorded outpatient facilities in poor areas but also to see that those facilities "serve the poor residents of poverty areas." [81] NANHC objects, in particular, to the interpretation of HEW that, it claims, allows the outpatient facilities in poverty areas to "limit their services to the paying public." [82]

The Act clearly and simply says, however, that "special consideration" should be given to facilities that serve the "residents" of poverty areas. The word, "residents," stands unadorned; the Act by its terms does not single out poor residents for "special consideration" but rather poverty areas. NANHC argues, nonetheless, that this court should look to the underlying purpose of the provision, as the literal meaning is "plainly at variance with the policy of the legislation." *United States v. American Trucking Associations.* [83]

After an examination of the legislative history here, we must conclude that the literal meaning of 42 U.S.C. § 291c(a)(4) fairly reflects the Congressional purpose, particularly in conjunction with other provisions. It is the case that the provision of outpatient services for the poor was one of the purposes of the 1970 amendments. The Senate Report said:

> [O]utpatient facilities should not only be encouraged as an alternate to inpatient care but should continue to be used as a method by which health care can be brought to urban and rural poor. . . .
> The committee therefore concluded that the encouragement of outpatient facilities, including freestanding outpatient centers, would most appropriately meet this two-pronged problem of promoting, where appropriate, alternate means for the delivery of care and providing accessible health care to the disadvantaged. [84]

However, it does not appear that the focus in the statute on the poverty of the *area* was inadvertent or unrecognized: an earlier Senate version of the provision [85] and the description in the Conference Report, [86] both track the language of the Act.

HEW urges us very strongly to consider the requirement of "special consideration" for poverty areas in conjunction with another statutory requirement that each facility aided by the Act, including, of course, outpatient facilities, make available "a reasonable volume of services to persons unable to pay therefor." [87] Thus, contrary to

---

80. Plaintiff's Motion for an Amended Order and/or Trial on Certain Facts and Issues, Para. 5, J.A. 66.

81. Appellant's Br. at 12.

82. *Ibid.*

83. 310 U.S. 534, 543, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940).

84. *Supra* n.56 at 3342–3343.

85. S. 2182 would have established a priority as follows:

> . . . in the case of projects for construction or modernization of outpatient facilities, to any outpatient facility that will be located in, and provide services for residents of, an area determined by the Secretary to be a metropolitan area with low per capita income
>
> . . . .
>
> (Appellant's Br. at 15.)

86. Conf.R.No. 91–1167, 91st Cong.2d Sess. (1970), 1970 U.S.Code Cong. & Adm. News 3362, 3366:

> The conference substitute provides that priority shall be given to projects for construction or modernization of out-patient facilities which are limited in and provide services for residents of rural or urban poverty areas
>
> . . . .

87. 42 U.S.C. § 291c(e)(2). This "free service" obligation became law as part of the original Hill-Burton Act of 1946. It was not until 1972, however, that HEW, under the pressure of multiple lawsuits, set out concrete standards for establishing the reasonableness of the volume of free services. 42 C.F.R. § 53.111. An applicant will be considered in "presumptive compliance" if, for a fiscal year, it "budgets for the support of, and makes available on request, uncompensated services at a level not less than the lesser of 3 percent of operating costs or 10 percent of all Federal assistance provided to or on behalf of the applicant under the Act," 42 C.F.R. § 53.111(d)(1). Alternatively, a facility is in presumptive compliance if it "certifies that it will not exclude any person from admission on the ground that such person is unable to pay for needed services . . . ," 42 C.F.R. § 53.-111(d)(2). *See generally* Comment, *Provision*

the characterizations of NANHC, the Act, as read literally, does not allow an outpatient facility to be located in a poverty area and yet "limit . . . its service to people who can pay."[88] Rather, HEW argues, the "special consideration" requirement more fully means that "projects be located in urban or rural poverty areas and serve the surrounding community with a reasonable volume of uncompensated service."[89]

"When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration," *Udall v. Tallman.*[90] The HEW interpretation accords first of all with the actual text of the statute, which, when plain enough, settles further dispute, *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission.*[91] HEW, moreover, appears to have reasonably inferred a Congressional design that the poor were to be benefitted by a placement of facilities in poverty areas, which would then be subject to the general obligation under the Act to provide a reasonable level of free service. No doubt HEW would be authorized to require assurances that the outpatient projects provided more free service, as the current requirement has been criticized for being too

low.[92] But to order HEW to do so, in the circumstances of this case, would amount to an unsupportable amendment to the Act.[93]

### B. *Designations of Poverty Areas*

After the District Court opinion below, NANHC moved to amend the Findings of Fact to include a finding that the designations by five named states of their poverty areas were improper, and that these inadequate plans were representative of all the states. NANHC therefore asked, in another motion, that "HEW . . . be directed to require reevaluation of the designation in all States."[94] We affirm the denial of those motions by the District Court. We find that the HEW regulations about poverty designations, on their face, comply with the Act. As to particular designations in particular plans, we hold that objections should be made in the first instance through the internal state appeals procedure established by the regulations.

■ The HEW regulations require each state plan, first of all, to designate the separate "areas" of the state.[95] An "area" may be a "service area" which is "based on geographic boundaries such as counties or census tracts" or a "subservice area" which, presumably, could be a "subarea of extreme poverty."[96] The regulations then specifi-

---

*of Free Medical Services by Hill-Burton Hospitals,* 8 Harv.Civ.Rights—Civ.Lib.L.Rev. 351 (1973).

**88.** Appellant's Br. at 12.

**89.** Appellees' Br. at 37.

**90.** 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

**91.** 146 U.S.App.D.C. 33, 449 F.2d 1109, 1126 (1971).

**92.** *See* Rose, *Federal Regulation of Services to the Poor under the Hill-Burton Act: Realities and Pitfalls,* 70 Nw.U.L.Rev. 168, 200 (1975), which concludes, after many other criticisms, that, "[t]o date, the Hill-Burton regulation on free service appears to have accomplished little for the indigent." A number of lawsuits, although not this one, have challenged the "free service" scheme as inadequate, *see e. g., Corum v. Beth Israel Medical Center,* 373 F.Supp. 550 (S.D.N.Y.1974), with the regulations generally sustained.

**93.** *Compare Sierra Club v. E.P.A.,* 176 U.S.App. D.C. 335, 540 F.2d 1114 (1976), which found, due to the stated policy in the Clean Air Act and its clear legislative history, that the agency was subject to a duty to prevent the "significant deterioration" of air that was cleaner than national standards, even though that duty was not written into the Act.

**94.** Plaintiffs' Opposition to Defendants' Motion for Clarification and Amendment of Order and Remedial Plan to Comply with Order, J.A. 80.

**95.** 42 C.F.R. § 53.129. See *supra* at n. 28.

**96.** 42 C.F.R. § 53.129. HEW does not expressly define the criteria of a "subservice area." But since one factor in the delineation of a "service area" is "population distribution," 42 C.F.R. § 53.1(d), the poverty of a small area—a "poverty pocket"—could be the basis for a "subservice area."

cally provide that "an area in which the median annual family income ranks in or below the 20th percentile of the [state] median annual family income" will be considered by HEW as a poverty area.[97] An area may also be designated a poverty area if it is between the 20th and 30th percentile in median family income, if the state so designates it and if HEW determines that it has "special characteristics related to poverty" such as a comparatively high cost for obtaining hospital services.[98]

NANHC objects to the allowed use of "such large geographic areas," like counties as service areas. For example, it states, "it is highly likely that urban counties will be ignored in determining poverty areas, as the percentage of poor will be larger in rural areas."[99] HEW, of course, has not required states to use county lines; the states can designate subservice areas, so-called "poverty pockets." For HEW to allow the states this option does not, on its face, violate the Act. After all, the Act envisions a sharing of responsibility between HEW and the states, akin to the "cooperative federalism" that has been recognized in other federal aid programs. *National Welfare Rights Organization v. Mathews.*[100] While HEW surely has the

power to require states to draw up smaller, more precise areas, especially since the Act charges HEW in the first instance with the duty of designation, the Act can reasonably be read to allow the states some latitude under HEW supervision and approval in making initial designations of areas. The issues related to the state abuse of that latitude will be discussed momentarily. Meanwhile, against the backdrop of federalism, let us briefly consider a last objection to one other aspect of the regulations.

■ NANHC contends that HEW, despite its regulations, has "failed to develop standards and criteria for the determination of need for outpatient facility construction. . . ."[101] The 1972 regulations were promulgated by HEW pursuant to its statutory duty to issue *general* regulations." HEW set out, first of all, a general goal against which to measure the need for different areas.[102] Then the regulations provided a general yardstick for determining priority within an area,[103] and finally, a method of measuring the number of existing outpatient facilities.[104]

NANHC attacks these regulations as providing little substantive guidance, since, for example, "there is no standard as to what

97. 42 C.F.R. § 53.129(a).

98. 42 C.F.R. § 53.129(b).

99. Appellant's Br. at 28–29.

100. 174 U.S.App.D.C. 410-414, 533 F.2d 637, 641 (1976) (Aid to Families with Dependent Children).

101. Appellants' Br. at 24. The opinion of the District Judge did not discuss the adequacy of HEW regulations in this area, nor did NANHC's motions to amend propose any such findings or conclusions. In its Proposed Conclusions prior to the opinion, however, NANHC stated that "HEW . . . had not developed any objective criteria to determine need . . . ." J.A. 89 n.5. We are inclined to accept the noninclusion of this finding in the opinion as a sufficient basis for appeal; NANHC does not prevail in any event.

102. § 53.51 State need (standard of adequacy).
Outpatient facilities shall be planned in sufficient number to make at least the basic minimum services readily available to all persons in the State. Provision of the basic

minimum services requires facilities for examination of patients by a physician or a dentist, and the provision of clinical laboratory and diagnostic X-ray services.

103. § 53.52 Distribution (service areas).
In determining the need for additional outpatient facilities in an area as a basis for distribution of such facilities, special consideration shall be given to areas in which there is a shortage of services provided by private physicians and dentists. . . .

104. § 53.53 Existing outpatient facilities.
(a) The count of existing outpatient facilities shall exclude:
(1) Offices of private physicians and dentists, whether for individual or group practices:
(2) Industrial clinics for employees only, first aid clinics, and similar facilities not furnishing a community service.
(b) Existing outpatient facilities shall be classified as conforming or nonconforming according to plant evaluation standards as set forth in Subpart E of this part.

constitutes a 'shortage,'" particularly in contrast to the "specific formula for the determination of need for acute and long-term beds . . . which govern priority for construction."[105] Once again, in a setting of "cooperative federalism," the federal agency is entitled to decide, within reasonable bounds, with what degree of specificity to set standards for state plans. Because one set is designed with specificity that does not mean that HEW cannot reasonably conclude that another set ought to be more general. In this instance, HEW points to the "difficulty in quantifying need, and thus the difficulty in developing criteria by which such quantifications could be accomplished."[106] The record shows that HEW has been examining more specific methods and would expect to adopt them if a more accurate method is formulated.[107] Meanwhile, the 1972 provisions plus the HEW review of state plans for approval provide a sufficient framework for general regulation. How a party properly challenges the HEW administration of the Act is the question which we now address.

■ NANHC contended before the District Court that particular named plans had improperly designated poverty areas, that these plans were representative of all the state plans, and that therefore HEW should reevaluate its approval of all the plans. The District Court, without opinion, refused

to amend its previous opinion to adopt these contentions and also refused to allow a trial on the disputed material facts.[108]

We affirm this decision on the ground that NANHC has not availed itself of its administrative remedies. The Act requires that each state plan "provide for affording to every applicant for a construction or modernization project an opportunity for a hearing before the State Agency."[109] Thus, if an NANHC member, like Franklin Fetter in South Carolina, is denied funds due to a low priority, it is presumably entitled, by HEW regulations[110] as well as by statute, to a hearing at which it can challenge the failure of the state to designate as a poverty area the "poverty pocket" in Charleston County that it serves. Any further appeal, whether to HEW or the judiciary, from an adverse decision by the state, would thereby be based on the fuller record developed at the hearing. "Suffice it to say that when a litigant goes into court before final administrative review has been had, only rarely and in exceptional circumstances is such a course justified," *Fitzgerald v. Hampton.*[111] In this case, NANHC has not alleged any basis for an exception to the exhaustion requirement, such as the futility of the administrative remedy.[112]

Other provisions of the Act, moreover, evidence a Congressional policy that the disapproval of state plans be undertaken

---

105. Appellant's Br. at 24–25. (Citations omitted).

106. Appellees' Br. at 57 n.41.

107. Affidavit of Duncan, Para. 3, J.A. 242.

108. With regard to one plan approved by HEW, NANHC stated that, "Under the 1972 Hill-Burton plan for the State of California, Beverly Hills was located in a service area determined to have a higher need for primary health care than the community of Watts." Appellant's Br. at 23 (footnote omitted). In support of the rationality of the designations, HEW responded that, "It is clear from the plan and from the survey of need conducted by the state that area 8–825.02, which includes Watts, had met 100% of its need for outpatient facilities (App. 476), while area 8–820.01, which includes Hollywood, Beverly Hills, and West Hollywood, had met only 37.5% of its need (App. 477–480)." Appellees' Br. at 59–60. HEW also noted that in California 33% of the 1971 allotment was

spent in poverty areas and 25.2% of the 1972 allotment, *ibid.* According to the standard of the Remedial Plan (25%), the California plan was thus in compliance with the "special consideration" provision. A full trial on all the issues sought to be proved by NANHC, particularly if the states are joined as parties, could well be a major undertaking.

109. 42 U.S.C. § 291d(a)(9).

110. 42 C.F.R. § 53.124. HEW requires the states to establish appeals procedures. The extent and adequacy of state compliance was not briefed by either side.

111. 152 U.S.App.D.C. 1, 467 F.2d 755, 768 (1972).

112. *See Wallace v. Lynn,* 165 U.S.App.D.C. 363, 507 F.2d 1186, 1190 (1974).

with ample opportunity for state defense and involvement. If HEW disapproves or modifies a state plan, the Act provides for appeal by right to the Federal Hospital Council.[113] If this Council[114] determines that HEW erred, then HEW must grant its approval, with no further recourse on its part. If the Council upholds HEW, however, the state is allowed an appeal to the United States court of appeals for *its* circuit which "*shall* have jurisdiction" of the appeal.[115] The structure set up here to avoid precipitate rejection by HEW of state plans, thus, buttresses a requirement of exhaustion for challenges by applicants to state plans. Even if the state were joined in a new proceeding below for a consolidated challenge to the plans, the judicial review would still constitute an unjustified bypassing of the individualized appeals procedure envisioned by the Act.

## C. THE HEW REMEDIAL PLAN

As noted earlier, HEW did not issue the regulations implementing the "special consideration" requirement of the 1970 amendments until January 1972. The District Court found that for FY's 1971 and 1972 HEW approved grants under state plans that did not provide for "special consideration" and that also for FY's 1973 and 1974 HEW approved grants under some state plans that were not amended to conform to the 1972 regulations. In its amended order[116] the District Court directed HEW to "recover those funds granted and/or expended without the 'special consideration' determination required by Section 291c(a)(4) unless all applicants entitled to special consideration have in fact received the funds that they would have received had the special consideration determination been made."

The HEW Plan[117] that ensued was opposed by a NANHC motion, which the District Court denied without opinion. We affirm its decision but do remand for an extension of time for the effectiveness of the Plan. The operative rule of the Plan is that a state will be considered in compliance with the "special consideration" requirement if 25% of its outpatient allotment for FY's 1973 and 1974 is obligated to projects in poverty areas. States below 25% are directed to award the next grants to poverty area projects for "60 days from the date of this notice or until the 25 percent criterion is met, whichever is earlier."[118] Even after the 60 days elapse, those states are to continue to make the next grants to poverty area projects unless, of course, no such applications are received or unless the state gives its reasons to HEW for not recommending a poverty area project. A state, moreover, is requested to reevaluate its designations of poverty areas if no need appears for poverty area projects. A state is also requested to publicize the availability of funds for poverty area projects, help such applicants with advice and information, and undertake a general review and revision of its plan.

The HEW Plan further directs "all States" to give poverty area projects first priority unless at the time a State approved a nonpoverty area project there were no applicants from poverty areas or unless it states its reasons, with HEW approval, for recommending a nonpoverty area project over a poverty area project. Each state, in addition, is to advise HEW of its receipt and disposition of each poverty area applicant. Finally HEW directs the internal division that administers Hill-Burton, along with the regional offices, to monitor the compliance of the states with the Plan.

**113.** 42 U.S.C. § 291d(b).

**114.** 42 U.S.C. § 291k. The Federal Hospital Council is a private body, consisting of twelve members appointed by the Secretary of HEW. Six are to be medical experts; six are to be consumer representatives. The constitutionality of their veto power over HEW regulations, 42 U.S.C. § 291c, was upheld in *Corum v. Beth*

*Israel Medical Center*, 373 F.Supp. 550, 551–553 (S.D.N.Y.1974).

**115.** 42 U.S.C. § 291h(a).

**116.** Court Order of 4 May 1976, J.A. 82.

**117.** *Supra*, n.8, J.A. 68–75.

**118.** *Id.*, J.A. 70.

So far as the FY's 1973 and 1974 are concerned, the Plan appears to be a reasonable implementation of the court order. NANHC argues that the rule of compliance is arbitrary and abusive since a state over the limit could then ignore poverty areas and "give 75% of its outpatient allotment to the affluent suburbs." [119] The Plan however, does not appear to discharge the states from their "special consideration" duty once the 25% mark is attained. It explicitly directs *all* states to give first priority to poverty area projects. And if a state wishes to fund a nonpoverty project instead, it must explain its reasons and may proceed only with HEW approval. It would be premature for this court on a bare record to pass judgment on the possible abuses of the Plan.

As for its alleged arbitrariness, 25% seems a fair criterion for presumptive compliance with "special consideration." "Special" may reasonably be read to be somewhere between, for example, "predominant" consideration, which could be 51%, and "some" consideration, which might be 10%.[120] The figure is also not so low as to be without real impact: by its terms, almost half of the states are deemed in noncompliance with the Act and are subject to the special strictures of the Plan. The figure also appears reasonable as a mandatory minimum in light of the distinct HEW scrutiny provided in the Plan over poverty area applicants beyond the 25%.

█ Entirely left out of the Plan, however, is any mechanism for recovering the funds that were spent in FY 1971 and FY 1972 prior to the HEW regulations. Such omission was NANHC's first objection to the Plan in its motion of opposition. The District Court found that of about $100 million awarded for outpatient grants in FY's 1971 and 1972 about $45 million went to poverty area projects. NANHC also challenged that latter figure, which HEW defended in its Brief. In a footnote to that defense is the only apparent explanation for the omission.

> We do not understand appellant's concern with 1971 and 1972 funds since they lapsed on June 30, 1974, and even if recovered would simply revert to the Treasury. Thus appellant's members could not benefit even if it prevailed.[121]

Even though HEW is undoubtedly correct on the timetable and mechanics of lapsing, its answer is insufficient here. HEW is already seeking to recover FY 1971 and 1972 funds that were illegally transferred. If the states can recover those monies spent and restore them to the outpatient category, then presumably the states can also recover these monies without the danger of lapsing. The answer may be that HEW is directing the states to recover the funds and to hold them themselves, thereby avoiding a lapse into the U. S. Treasury, for future availability to outpatient projects. In any event, a District Court is enabled, as we shall see, to order funds to be held available, beyond a statutory lapse, if equity so requires. The HEW explanation, then, for the omission is not conclusive.

The District Court found, as noted, that almost half (about 45%) of the FY 1971 and 1972 funds were spent in poverty areas. It may be that the District Court believed that, as an aggregate matter, the awarding of outpatient monies did comply with the Act, even in the absence of regulations,

119. Appellant's Br. at 38.

120. As the figure, on its face, appears a reasonable definition for "special," it is not necessary to examine alternative grounds for rationality. In fact, HEW states that it "extracted" the figure from the "successor legislation to Title VI of the Hill-Burton Act." Appellees' Br. at 42 n.31. In 1975 Congress passed a new law to provide, among other things, for the distribution of outpatient funds. Pub.L.No.93–641, 88 Stat. 2225 (1975). While similar in many respects to the relevant law in this case, *e. g.,* in the language on "special consideration" for outpatient facilities in poverty areas, 42 U.S.C. § 300*o*–1(1)(C) (Supp. IV, 1974), the new law contains the following addition:

> [N]ot less than 25 per centum of the amount of a State's allotment available for obligation in that fiscal year shall be obligated for projects for outpatient facilities which will serve medically underserved populations. 42 U.S.C. § 300p–1(d)(2) (Supp. IV, 1974).

121. Appellees' Br. at 41 n.30 (citation omitted).

because, in fact, such a sizeable portion of the funding went to poverty areas. Its decision to allow the FY 1971 and 1972 distributions to remain undisturbed thus appears to have a rational basis, especially in light of its valid approval of 25%, a much lesser figure, as a measure of satisfaction of the "special consideration" duty. Even though a newly eligible type of applicant, the "freestanding" facility, was wrongfully left out of the distribution,[122] the District Court could reasonably have concluded that the ultimate beneficiaries of the Act—the residents of poverty areas—received their statutory due with a share of 45%.

One final matter remains. NANHC moved to amend the order of the District Court so as "to extend the period of time during which monies may be obligated until March 1, 1977."[123] The District Court denied this request. We remand this issue for determination of the exact period of extension. In the interim this court orders that the funds involved in this case continue to be made available. At oral argument, on 15 September 1976, HEW raised the possibility that this case would be moot as of 1 October 1976 because, it stated, the funds in contention could not be made available to the states for outpatient projects beyond that date. The basis for the unavailability would be that the unspent FY 1973 and 1974 funds would lapse into the Treasury on or about 30 September and be "beyond recall." In addition, HEW informed the court that a new law for the distribution of outpatient funds would become effective 1 October. With the old law thus replaced, HEW would lack authority to continue obligations and grants under its Plan. Neither of these grounds must moot the case.

"[T]he equitable power of the Federal Courts is broad, and it is a well-established prerogative of the Court to treat as done that which should have been done."[124] Indeed, the trial court in this case ordered that funds which had been impounded and then released continue to be made available to the states beyond the lapsing date.[125] That earlier order is conceivably different, however, since HEW would continue its disbursements under the authority of the original statute. Here, it is urged, HEW is without authority to continue since the original statute has been replaced. But, the new statute,[126] in pertinent part, appears quite similar to the old one, the subject of this case, and may well provide continued authority for the HEW Plan. As this issue has not been at all briefed before this court, it should remain open on remand for fuller determination. In any event, to repeat, HEW is directed in the interim to continue the operation of the Plan, which was only issued in April 1976. To remedy violations that persisted through FY's 1973 and 1974 the Plan should be afforded ample time. As noted, the determination of the precise extension of time to be ordered remains for the District Court.

Also remaining for the District Court, as detailed earlier, is the determination of which outpatient monies, in excess of the maximum allowed, can, in fact, be traced into the hospital categories. As shown above, indirect transfers taking longer than six months, even conducted in good faith, cannot automatically be considered legal. With respect to all the other issues discussed in this opinion, however, the decisions of the District Court are affirmed.

**122.** See text at notes 70–71, *supra*.

**123.** Plaintiff's Motion for an Amended Order and/or Trial on Certain Facts and Issues, J.A. 66.

**124.** *Commonwealth of Penn. v. Weinberger*, 367 F.Supp. 1378, 1387 (D.D.C.1973).

**125.** Order and Partial Summary Judgment, 6 June 1974, J.A. 35.

**126.** See n.120, *supra*.