**WEST VIRGINIA ASSOCIATION OF COMMUNITY HEALTH CENTERS, INC., et al., Appellants**

v.

**Margaret M. HECKLER, Secretary, Health & Human Services.**

**No. 83–2113.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 9, 1984.

Decided May 18, 1984.

---

**1572**

James L. Feldesman, Washington, D.C., with whom Jacqueline C. Leifer, Washington, D.C., was on the brief, for appellants.

Edward R. Cohen, Washington, D.C., of the Bar of the Supreme Court of New York, pro hac vice, by special leave of the Court, with whom Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Anthony J. Steinmeyer, Atty. Dept. of Justice, Washington, D.C., were on the brief, for appellee.

Before WRIGHT, BORK and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This case arises under a federal block grant statute which provides financial assistance to States to support the delivery of health services to needy populations. In appealing from the District Court's denial of a preliminary injunction, appellants ask this court to hold that the Secretary of Health and Human Services ("HHS") unlawfully calculated the amount of funding to which the State of West Virginia is entitled under the federal block grant program. We conclude that, while appellants have standing to assert their claims, the legal issues with respect to fiscal year 1983 funding are now moot, inasmuch as all such funds have been awarded and disbursed by the Secretary. For the reasons set forth below, we also decline to reach the merits of appellants' claims with respect to fiscal year 1984 funds. We do, however, retain jurisdiction over this case to ensure that these latter claims are subject to prompt appellate review.

## I.

Appellants are the West Virginia Association of Community Health Centers, Inc. ("WVACHC") and the Mountaineer Family Health Plan, Inc. ("Mountaineer"). WVACHC is a nonprofit organization consisting of eleven of West Virginia's 22 community health centers ("CHC's").[1] Mountaineer is an individual West Virginia CHC that belongs to WVACHC.

On September 8, 1983, with the expiration of fiscal year 1983 looming only three weeks away, appellants filed suit against the Secretary of HHS, seeking both a preliminary injunction and permanent relief. Appellants alleged that the formula adopted by the Secretary for awarding block grants to participating States under the Primary Care Block Grant ("PCBG") statute, 42 U.S.C. § 300y,[2] unlawfully deprived the State of West Virginia of monies

---

**1.** A community health center is an entity whose principal responsibility is the provision of "primary health services," which are generally preventive and outpatient in nature. See 42 U.S.C. § 254c(a, b). Notwithstanding the use of the block grant mechanism, whereby federal grants are made directly to the participating States, categorical grants may be awarded by the Secretary of HHS to public and nonprofit CHC's serving medically underserved populations in States which are not participants in the block grant program. Id. § 254c(d). See also note 2, infra.

**2.** The PCBG statute was passed as part of the Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 357 (1981) (codified in various sections of U.S.Code), a statute which has not infrequently been at issue in recent federal litigation. See, e.g., Petry v. Block, 697

to which it was entitled.[3] The parties apparently agreed that if appellants' challenge to the Secretary's funding formula was sustained, West Virginia would be entitled to an additional $299,950 in fiscal year 1983 ("FY83") funding. *See* Plaintiff's Motion for Leave to Amend Complaint, at 1 n. 1 (filed with District Court Oct. 14, 1983) (seeking to amend complaint to reflect, *inter alia,* this mutual understanding). Appellants also sought relief against the Secretary's implementation of the challenged formula in FY84. It cannot be determined, however, what amount is at issue for the current fiscal year.

The District Court advised the parties at a hearing on September 30, 1983 that it would not grant a preliminary injunction as to FY83 funds; the court subsequently issued a formal order and accompanying memorandum opinion denying preliminary relief. *WVACHC v. Heckler,* C.A. No. 83–2651 (D.D.C. Oct. 17, 1983). The court grounded its holding upon its application of the four factors governing requests for interim, equitable relief in this Circuit. Memorandum Opinion at 7–14; *see, e.g., Ambach v. Bell,* 686 F.2d 974, 979 (D.C.Cir. 1982) (per curiam) (citing *Virginia Petroleum Jobbers Association v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958) (per curiam)); *National Association of Farmworkers Organizations v. Marshall,* 628 F.2d 604, 613

(D.C.Cir.1980); *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir. 1977).

The initial factor considered by the District Court was appellants' likelihood of success. Memorandum Opinion at 7–12. After extensively analyzing the PCBG statutory scheme, the court concluded that the Secretary's allocation formula was a reasonable one that did not appear inconsistent with the statute. *Id.* at 11. The court thus held that appellants had not demonstrated a sufficient likelihood of success to warrant issuance of a preliminary injunction. *Id.* at 12.

The court's analysis of the remaining three factors buttressed its decision. In the District Court's view, appellants' claim of irreparable injury was speculative because they could not demonstrate that the Secretary's actions were actually causing a denial of additional funding that they otherwise would receive. *Id.* Furthermore, the court concluded that a preliminary injunction should not issue in light of the harm that would thereby be caused to CHC's outside West Virginia. Specifically, the court found that an award of increased funding to West Virginia could not be made without *totally* denying funding to two CHC's in Michigan and California. *Id.* at 13. Finally, the court held that the

F.2d 1169 (D.C.Cir.1983) (per curiam); *Ambach v. Bell,* 686 F.2d 974 (D.C.Cir.1982) (per curiam). Under the PCBG statute, participating States receive a block grant from the federal government and assume exclusive responsibility for administering the funding of CHC's within the State. *See* 42 U.S.C. §§ 300y–3 to 300y–5. The administration of funding for CHC's located in States not participating in the PCBG program continues to be the federal government's responsibility under the § 254c categorical grant program referred to in note 1, *supra. See* 42 U.S.C. § 300y–2. The State of West Virginia chose to participate in the PCBG program beginning in fiscal year 1983, the first year of the program's existence. Thus, the funding of West Virginia CHC's is now administered exclusively by the State.

**3.** Appellants' challenge to the Secretary's funding formula is predicated upon 42 U.S.C.

§ 300y–3, which requires the Secretary to provide a State participating in the PCBG program in FY83 or FY84 with the same percentage of overall funding as that State's CHC's had collectively been awarded "[u]nder [the] 42 U.S.C. § 254c" categorical program in FY82. The Secretary calculated the amount of block grant funding to which West Virginia is entitled by excluding the amount of "phaseout funding" (*i.e.,* grants to CHC's whose future funding the Secretary had decided to discontinue) that West Virginia's CHC's had been awarded in FY82 under the categorical program. Briefly stated, appellants' argument is that phaseout funding was an administrative creation that could only have been awarded pursuant to § 254c. Hence, in appellants' view, FY82 phaseout funding must be included in the block grant allocation formula.

issuance of a preliminary injunction would not serve the public interest. *Id.* at 14.

Appellants filed a timely notice of appeal and now seek reversal. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## II.

### A.

■ The threshold issue before us is whether appellants have standing to prosecute this action. In denying preliminary injunctive relief, the District Court specifically left this question open. We must nevertheless decide this issue, inasmuch as it bears fundamentally upon our jurisdiction to decide the case. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 260, 97 S.Ct. 555, 560, 50 L.Ed.2d 450 (1977) (citing *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969) (plurality opinion)).

■ To invoke federal jurisdiction, a party must show at a minimum that the challenged actions have caused it injury that is likely to be redressed by a favorable judicial decision. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).[4] The Secretary argues that appellants have not satisfied these requirements, inasmuch as they have failed to demonstrate that a judicial decision mandating an increase in West Virginia's PCBG funding would redound to their benefit. In this regard, the Secretary relies principally upon the fact that West Virginia would have complete discretion to award any additional funding it might receive to other CHC's within the State which are not parties to this lawsuit. In response to this line of reasoning, appellants argue that they have been injured by being denied an opportunity to compete for this increased funding, and that to have standing they need not demonstrate that they would actually receive the additional funding.[5] Our examination of applicable law mandates the conclusion that appellants do indeed have standing to sue.

The Supreme Court decision in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), provides the logical starting point for this branch of our inquiry. In that case, a legal challenge was mounted against a local government's refusal to rezone a parcel of real estate to

---

**4.** As an association, WVACHC will have standing to sue if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The dispute regarding WVACHC's standing principally concerns whether any of its members have standing in their own right; if so, there is little doubt that WVACHC is a proper representative. Furthermore, a member of WVACHC (Mountaineer) is a named plaintiff in the lawsuit.

**5.** The Secretary argues that the original complaint filed by appellants does not specifically characterize their injury as the denial of a "right to apply for" these extra funds. In an amended complaint that has neither been accepted nor rejected by the District Court, however, appellants do specifically allege that their injury is the denial of an opportunity to apply for extra funds. There does not appear to be any reason why this amended complaint will not be accepted by the District Court. *See* Fed.R.Civ.P. 15(a) ("leave [to amend a pleading] shall be freely given when justice so requires"); *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). More importantly, the original complaint does not appear deficient with regard to standing. In their original complaint, appellants adequately pleaded the facts giving rise to their injury; it is not necessary that appellants plead their injury in terms of a legal conclusion. *Cf.* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."); *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.") (citation omitted).

permit a private development concern to construct a townhouse complex for low- and moderate-income tenants. The Court held that the development firm had standing to bring its challenge, even though there was no guarantee that the project would ultimately be built if the rezoning request were granted. *Id.* at 261–62, 97 S.Ct. at 561–562. But, importantly for our case, the Court also considered the standing of an individual plaintiff, because it was questionable whether the developer would be allowed to advance the claim that the rezoning refusal resulted from racial prejudice. In a holding that has direct bearing upon the present case, the Court stated:

> [The individual plaintiff] works ... in Arlington Heights and lives approximately 20 miles away.... The complaint alleged that he seeks and would qualify for the housing MHDC wants to build in Arlington Heights. [The plaintiff] testified at trial that if [the proposed project] were built *he would probably move there,* since it is closer to his job.
>
> The injury [the plaintiff] asserts is that his *quest for housing* nearer his employment has been thwarted by official action that is racially discriminatory. If a court grants the relief he seeks, there is at least a "substantial probability," that the [housing] project will materialize, affording [the plaintiff] the *housing opportunity* he desires in Arlington Heights. His is not a generalized grievance. Instead, ... it focuses on a particular project and is not dependent on speculation about the possible actions of third parties not before the court. * * * [The plaintiff] has adequately averred an "actionable causal relationship" between Arlington Heights' zoning practices and his asserted injury.

*Id.* at 264, 97 S.Ct. at 563 (citations omitted; emphasis added). The Court's language plainly indicates that the individual plaintiff's injury was the denial of an opportunity to obtain housing for which he would otherwise be qualified. Certainty of success in seeking to exploit that opportunity was not required.[6]

The Supreme Court's treatment of standing in *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), lends additional support to our conclusion. In *Bakke,* the Regents argued that a rejected medical school applicant did not have standing to challenge the school's affirmative action admissions program, unless the applicant could show that he would have been admitted but for the challenged program. The Supreme Court squarely rejected this argument, stating:

> [E]ven if Bakke had been unable to prove that he would have been admitted in the absence of the special program, it would not follow that he lacked standing. The constitutional element of standing is plaintiff's demonstration of any injury to himself that is likely to be redressed by favorable decision of his claim. The trial court found such an injury, apart from failure to be admitted, in the University's decision not to permit Bakke to compete for all 100 places in the class, simply because of his race. Hence the constitutional requirements of Art. III were met. The question of Bakke's admission *vel non* is merely one of relief.

*Id.* at 280–81 n. 14, 98 S.Ct. at 2743 n. 14 (opinion of Powell, J., for the Court) (citations omitted).[7]

Furthermore, this court has upheld standing in a case remarkably similar to

---

**6.** Although required to demonstrate a substantial probability that the project would be built but for the challenged action, the individual plaintiff in *Arlington Heights* was not required to demonstrate a particular degree of likelihood that a favorable decision would result in his ultimately living in the project. Instead, the *Arlington Heights* Court held that standing re-

quirements were satisfied by the plaintiff's showing that a favorable judicial decision was likely to provide him with a housing opportunity.

**7.** Other Supreme Court decisions provide yet further support to the notion that a plaintiff has standing where the requisite elements of stand-

the one at hand. In *National Association of Neighborhood Health Centers, Inc. (NANHC) v. Mathews*, 551 F.2d 321 (D.C. Cir.1976), a nationwide organization of community health centers sought, among other things, to compel the former·Department of Health, Education and Welfare ("HEW") to recover certain funds that had allegedly been improperly expended. The plaintiff organization represented that some of its members would then compete for the recovered funds. This court held that NANHC had standing on behalf of its members, because "[t]he less that is recovered [by HEW] ..., the less will be available to the present applicants, including the NANHC members; these members are directly hurt by ... the sharp curtailment of their opportunities for funding." *Id.* at 329. The court further stated that "[w]hile it is not certain that NANHC members would be funded due to the extra recovery from their claim here, it is probable that the prospect of funding, itself substantial relief, would be enhanced." *Id. See also Planned Parenthood Association of Chicago Area v. Kempiners*, 700 F.2d 1115, 1118–23 (7th Cir.1983) (opinion of Cudahy, J.); *id.* at 1135–38 (opinion of Posner, J.).

■ Under this line of cases, once appellants demonstrated that they would qualify to receive these funds, they need not shoulder the additional burden of demonstrating that they are certain to receive funding. The situation in this case thus differs starkly from those cases in which a plaintiff's alleged injury flows from the actions of a third party not before the court. *See, e.g., Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Von Aulock v. Smith*, 720 F.2d 176 (D.C.Cir.1983); *Common Cause v. Department of Energy*, 702 F.2d 245 (D.C.Cir.1983). In such cases, a plaintiff may not be accorded standing

based upon a speculative charge that the defendant's actions are encouraging the third party to act in a manner harmful to the plaintiff. As has been demonstrated, this case presents a markedly different situation. We therefore conclude that appellants have standing to seek relief that would allow them to compete for additional funding.

### B.

The existence of standing to sue does not, of course, mean that events during the pendency of the lawsuit may not render effective relief impossible. The Secretary contends that appellants' lawsuit is moot insofar as it concerns FY83 funds, all of which have previously been awarded. While we decline to hold that appellants' entire lawsuit is moot, we conclude that equitable relief is no longer available with respect to FY83 funds.

■ It is an elementary principle of the federal budget process that, in general, a federal agency's budget authority lapses on the last day of the period for which funds were obligated. *See* 31 U.S.C. § 1502(a); *National Association of Regional Councils v. Costle*, 564 F.2d 583, 587 (D.C.Cir.1977). At that point, the unobligated funds revert back into the general Treasury. *See* 31 U.S.C. § 1552(a)(2). In the present case, the Secretary's budget authority with regard to FY83 funding lapsed on September 30, 1983, the last day of the fiscal year for which the funds were appropriated. *See* 42 U.S.C. § 300y-1.

Notwithstanding these basic principles of federal budgetary law, an equitable doctrine has been fashioned by the federal courts in recent years to permit funds to be awarded to a deserving plaintiff even after the statutory lapse date, as long as the lawsuit was instituted on or before that

ing are met, even though attainment of his or her ultimate goal depends upon independent future actions. *See, e.g., Larson v. Valente*, 456 U.S. 228, 238–44, 102 S.Ct. 1673, 1680-1683, 72

L.Ed.2d 33 (1982); *Orr v. Orr*, 440 U.S. 268, 271–73, 99 S.Ct. 1102, 1107–1108, 59 L.Ed.2d 306 (1979).

date. *See, e.g., Connecticut v. Schweiker,* 684 F.2d 979, 996–99 (D.C.Cir.1982), *cert. denied,* 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983); *National Association of Regional Councils, supra,* 564 F.2d at 588; *Jacksonville Port Authority v. Adams,* 556 F.2d 52, 55–57 (D.C.Cir.1977); *City of Los Angeles v. Adams,* 556 F.2d 40, 51 (D.C.Cir.1977). *See also* 31 U.S.C. § 1502(b) ("A provision of law requiring that the balance of an appropriation or fund be returned to the general fund of the Treasury at the end of a definite period does not affect the status of lawsuits or rights of action involving the right to an amount payable from the balance."). The doctrine has been likened to the equitable principles of constructive trust and equitable lien. *Jacksonville Port Authority, supra,* 556 F.2d at 56.

Application of this equitable doctrine, however, assumes that funds remain after the statutory lapse date. *See Connecticut v. Schweiker, supra,* 684 F.2d at 999 ("we point out that the scope of that relief is limited to the amount of fiscal year 1981 funds which remain available"). In the present case, appellants concede that *all* FY83 PCBG funds have been awarded by the Secretary to various recipients. Although it might be argued that funds remain "available" where they have been awarded to a recipient who, in turn, has not yet expended them, another decision of this court appears to undercut that contention.

*See Ambach v. Bell,* 686 F.2d 974, 986 (D.C.Cir.1982) (per curiam) ("Once the chapter 1 funds are distributed to the States and obligated, they cannot be recouped. It will [then] be impossible ... to award the plaintiffs the relief they request if they should eventually prevail on the merits."); *see also International Union UAW v. Donovan,* 570 F.Supp. 210, 220–23 (D.D.C.1983) (assuming the funds remain available only to the extent that they have not previously been obligated by the federal government to a recipient), *appeal pending,* Nos. 83–1918, 83–2082 (D.C.Cir. argued Jan. 25, 1984).

As a result, the equitable doctrine permitting a judicial award of funds after the statutory lapse date will ordinarily, as here, have no application to a case in which all funds have properly been awarded.[8] Accordingly, we dismiss as moot appellants' claims regarding FY83 funds, and we vacate the District Court's order denying preliminary injunctive relief. *See United States v. Munsingwear,* 340 U.S. 36, 39–41, 71 S.Ct. 104, 106–107, 95 L.Ed. 36 (1950); *Weaver v. UMWA,* 492 F.2d 580, 587 & n. 36 (D.C.Cir.1973) (per curiam), *cited with approval, Aviation Enterprises, Inc. v. Orr,* 716 F.2d 1403, 1408 n. 35 (D.C.Cir. 1983) (per curiam).

## C.

While appellants' challenge to the allocation of FY83 funds is no longer cognizable,

8. *See National Ass'n of Neighborhood Health Centers, Inc. v. Mathews,* 551 F.2d 321 (D.C.Cir. 1976), which is discussed in the text at p. 1575–76, *supra.* In *Neighborhood Health Centers,* the court held that a plaintiff's entitlement to federal funds could be satisfied out of funds that had previously been awarded. *See id.* at 338–39. That case is clearly distinguishable from the situation before us, however, because the original recipients there had improperly received the funds that should have been awarded to the plaintiff or other similarly situated entities. Furthermore, the federal government in that case was already seeking to recover the previously awarded funds. *See id.* at 338 ("HEW is already seeking to recover FY 1971 and 1972 funds that were illegally transferred.").

In the present case, there is no indication whatever that increased funding may be awarded to West Virginia by recovering funds from undeserving recipients. More importantly, even

if there were funds that could be so recovered, unlike *Neighborhood Health Centers,* no nexus would exist between the extra funds sought by appellants and any funds that were improperly awarded to other CHC's. We therefore reject appellants' contention that *Neighborhood Health Centers* compels a contrary result.

In so doing we do not mean to suggest our approval, in every case, of government decisions to expend funds over which a legal controversy exists. In this case the District Court denied preliminary relief one day before the statutory lapse date. HHS thus faced a decision of expending the funds at issue or losing them through reversion to the Treasury. Its decision under these circumstances was entirely proper, despite its effect on appellate review of the denial of preliminary relief.

the Secretary plans to distribute West Virginia's FY84 funds in accordance with the same formula. Relying heavily upon this fact, appellants request this court to reach the merits of their statutory claim regardless of the availability of relief as to FY83 funds. According to appellants, a remand would needlessly tax the resources of the judiciary and the parties, inasmuch as the District Court provided no indication that it would be willing to reconsider its legal conclusion that the Secretary's allocation formula is consistent with the PCBG statute.[9] We find this contention to be severely undermined by the Supreme Court's disposition of *University of Texas v. Camenisch*, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981), and incompatible, under the circumstances here, with the orderly administration of justice.

In *Camenisch*, a district court issued a preliminary injunction requiring the University of Texas to pay the costs of providing a sign language interpreter for the plaintiff, a deaf graduate student. The district court conditioned this preliminary injunction upon plaintiff's posting a security bond pending the outcome of the litigation. By the time the University's appeal from the grant of a preliminary injunction was heard by the United States Court of Appeals for the Fifth Circuit, plaintiff had already graduated. The Fifth Circuit nevertheless reached the merits of the dispute on the ground that the issue of which party should pay for the interpreter remained justiciable.

The Supreme Court vacated the Fifth Circuit's decision and remanded the case to the district court for trial on the merits. The Court held that the only issue properly before the Fifth Circuit was the correctness of the preliminary injunction, an issue mooted by plaintiff's graduation. 451 U.S. at 394, 101 S.Ct. at 1833. The Court rejected the argument that the district court's consideration of plaintiff's likelihood of success on the merits was tantamount to a decision on the merits. According to the Court, such an argument "improperly equates 'likelihood of success' with 'success,' and what is more important, ... it ignores the significant procedural differences between preliminary and permanent injunctions." *Id.* Stressing that the preliminary injunction was designed for the limited purpose of preserving the parties' relative positions prior to trial, the Court concluded that "it is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits." *Id.* at 395, 101 S.Ct. at 1834. The Court noted that Fed.R.Civ.P. 65(a)(2), which allows the preliminary injunction hearing to be collapsed into the trial on the merits, provides a method, where appropriate, of obtaining an expedited decision on the merits. *Id.*

■ The Supreme Court's teaching in *Camenisch* applies with full force here. In denying preliminary injunctive relief, the District Court's inquiry into the merits was limited to a determination whether appellants demonstrated that their claim was likely to meet with success.[10] Furthermore, the denial of the preliminary injunction was also based upon the District Court's conclusions that appellants were not threatened with irreparable harm, that other CHC's would be harmed by the grant of a preliminary injunction, and that the public interest did not support a preliminary injunction.

---

**9.** In considering this argument, we are mindful that the subject of this appeal is the District Court's denial of a preliminary injunction. Appellants' motion in the court below sought relief only as to the use of the challenged allocation formula in the awarding of FY83 funds. Thus, as will be discussed in the text that follows, the District Court has not adjudicated on the merits the substantive claim advanced by appellants; rather, the court simply denied extraordinary interlocutory relief.

**10.** Indeed, an individual who demonstrates that the remaining considerations strongly favor preliminary injunctive relief need not demonstrate a mathematical probability of success on the merits; in such a case, it is sufficient that the claim presents a substantial question on the merits. *McSurely v. McClellan*, 697 F.2d 309, 317 (D.C.Cir.1982) (per curiam); *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977).

We, of course, do not interpret *Camenisch* as erecting an insurmountable bar to an appellate court's issuing a final decision on the merits where the appeal is merely from the grant or denial of a preliminary injunction.[11] But *Camenisch* plainly provides us with considerable pause in reaching out to address on the merits an important and complex issue of statutory interpretation.

Moreover, quite apart from *Camenisch*, this case as now before us provides an inappropriate setting in which to issue a final decision on the merits. As we have seen, the correctness *vel non* of the District Court's preliminary injunction denial is no longer cognizable because all FY83 funds have been awarded. Furthermore, the legal issues with respect to West Virginia's FY84 funding may be mooted by the State's recently announced intention to withdraw from the PCBG program. *See* Appellants' Supplement to Record (filed Feb. 29, 1984) (copy of Feb. 13, 1984 Letter from Governor John D. Rockefeller IV to West Virginia Department of Health instructing the initiation of action to terminate the State's participation in PCBG program). At present, it is unclear whether this impending withdrawal will be effectuated prior to the end of FY84 and, if so, whether appellants' claim that West Virginia is entitled to additional FY84 funding would thereby be mooted. In light of these considerations, we decline appellants' invitation to reach the merits of a complex statutory issue.

### D.

While we do not reach the merits of appellants' statutory claim, we are not unsympathetic to appellants' lament that the inexorable march of time may result in their being denied an effective opportunity for appellate review of their claim as to FY84 funds.[12] If we were simply to remand the case to the District Court, an appeal from whatever order the court entered on remand would likely not be heard until well into our September 1984 Term. At that point, if unsuccessful below, appellants would likely be faced with the same difficulties with regard to FY84 funds that they encountered here with respect to FY83 funds.

In light of these unusual circumstances, we will retain jurisdiction to ensure that appellants receive timely appellate consid-

---

11. This court has previously suggested that an appellate court has jurisdiction to direct the entry of a final judgment even though the appeal is only from a district court's grant or denial of a preliminary injunction. *Energy Action Educ. Found. v. Andrus*, 654 F.2d 735, 745 & n. 54 (D.C.Cir.1980), *rev'd on other grounds*, 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981); *see also* 16 C. WRIGHT, A. MILLER, E. COOPER & E. GRESSMAN, FEDERAL PRACTICE & PROCEDURE § 3921, at 17 (1977). We do not believe that *Camenisch*—which was apparently grounded upon prudential considerations, *see* 451 U.S. at 395, 101 S.Ct. at 1834—casts doubt upon an appellate court's *authority* to extend review beyond the preliminary injunction issue. The Court's language also appears to leave open the possibility that in rare cases final judgment may be directed on an appeal from the grant or denial of a preliminary injunction.

We further note that *Camenisch* does not preclude close scrutiny of the district court's legal analysis in appropriate cases. Although the scope of appellate review in preliminary injunction cases is generally limited to determining whether the district court abused its discretion, *see, e.g., Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–2568, 45 L.Ed.2d 648

(1975), "a greater amplitude of judicial review is called for when the appeal presents a substantial issue that the action of the trial judge was based on a premise as to the pertinent rule of law that was erroneous." *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 832 (D.C.Cir.1972); *accord Spencer v. N.L.R.B.*, 712 F.2d 539, 565 (D.C.Cir.1983); *Ambach v. Bell*, 686 F.2d 974, 979–80 (D.C.Cir.1982) (per curiam); *Delaware & Hudson Ry. Co. v. United Transp. Union*, 450 F.2d 603, 620 (D.C.Cir.), *cert. denied*, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971). Reversal of a district court's preliminary injunction decision based upon an incorrect legal analysis by the trial court "is not based on, or to be construed as, a determination of arbitrary abuse of judicial discretion." *NRDC v. Morton, supra*, 458 F.2d at 832. Ordinarily, this review will be sufficient to protect the rights of an appellant pending final decision on the merits.

12. This discussion assumes, necessarily, that the case or controversy is not moot. That threshold determination is, of course, to be made in the first instance by the District Court before addressing the merits of the statutory interpretation issue.

eration of their claims regarding any FY84 funding to which West Virginia may be entitled. *See* 16 C. WRIGHT, A. MILLER, E. COOPER & E. GRESSMAN, FEDERAL PRACTICE & PROCEDURE § 3937, at 109 (Supp.1983) (an appellate court's "power to retain jurisdiction in [appropriate] circumstances is desirable, and it seems likely that it should be exercised profitably in more cases than present opinions reflect"); *see also United States v. Simmons*, 670 F.2d 365, 372 (D.C. Cir.1982) (per curiam), *after remand*, 699 F.2d 1250 (D.C.Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 121, 78 L.Ed.2d 119 (1983); *United States v. American Telephone and Telegraph Co.*, 551 F.2d 384, 394–95 (D.C. Cir.1976), *after remand*, 567 F.2d 121 (D.C. Cir.1977); *cf. Quincy Cable TV, Inc. v. FCC*, 730 F.2d 1549 (D.C.Cir.1984) (per curiam) (retaining jurisdiction but remanding record to administrative agency for further proceedings).

In accordance with the normal procedures governing our retention of jurisdiction, *see* D.C.Circuit Rule 13(d), we will remand the record in this case to the District Court for further proceedings, including the development of facts bearing on the question of mootness *vel non*. In this regard, we respectfully direct the District Court to determine whether, notwithstanding West Virginia's announced intention to withdraw from the PCBG program, the State has received or will receive any FY84 funding pursuant to the challenged allocation formula. If West Virginia has received or will receive any FY84 funding in an amount less than it would have received under the allocation formula asserted by appellants to be statutorily mandated, a live controversy may remain regardless of whether West Virginia subsequently withdraws from the PCBG program.[13]

If the case is determined not to be moot, the District Court should thereupon decide whether West Virginia is entitled to additional FY84 funding.[14] The District Court is further directed, in the interests of justice, to enter an appropriate order with respect to appellants' FY84 funding claim by no later than September 10, 1984.[15] At that point, the losing party may bring its appeal before this panel, without filing a new notice of appeal, upon application to be filed no later than ten days after the District Court's entry of the order.

### III.

For the reasons stated above, the record in this case is remanded to the District Court for further proceedings with respect to appellants' FY84 funding claim, including a determination of mootness *vel non*. This panel will retain jurisdiction of the matter in the interests of judicial economy, consistent with fairness to all parties to this proceeding.

*It is so ordered.*

---

**13.** Without the benefit of facts yet to be developed we could not—and we do not—opine on the issue of mootness *vel non* if any FY 84 funds have been disbursed to the State of West Virginia pursuant to the challenged allocation formula. That issue is properly addressed by the District Judge on remand.

**14.** The Secretary is, of course, now forewarned by the continuation of this litigation, filed late in FY83, of the advisability of utilizing FY84 funds in a manner that allows for the contingency that West Virginia may be held entitled to extra funding, should appellants prevail.

**15.** We note parenthetically that the District Court held in connection with its preliminary injunction denial that appellants' claim of irreparable injury was speculative since, in the court's view, it was not certain that the Secretary's actions had caused appellants to lose funds they would otherwise have received. Our holding that the injury suffered by appellants is sufficient to support standing necessarily removes this as a ground upon which to premise the denial of relief. On remand, therefore, the determinative factor should be the merits of appellants' statutory claim. Although the District Court has previously determined that appellants are unlikely to succeed on the merits of their claim, we, moved by the spirit of *Camenisch*, respectfully encourage a fresh look at the statutory scheme, in the less truncated setting of a final adjudication of the parties' rights and obligations.