CC DISTRIBUTORS, INC. and
Whitman Distributing
Company, Appellants,

v.

UNITED STATES of America, et al.

Nos. 89–5041, 89–5042

United States Court of Appeals,
District of Columbia Circuit.

Argued May 23, 1989.

Decided Aug. 22, 1989.

George W. Miller, with whom John G. Roberts, Jr., Robert G. Fryling, John W. Fowler, Jr., and Holly A. Brown, Philadelphia, Pa., were on the joint brief, for appellants.

Susan Nellor, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates, and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees.

Before ROBINSON, D.H. GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The Air Force established the Contractor Operated Civil Engineer Supply Stores (CO-CESS) program in the early 1970s, in the expectation that privately operated stores could supply materials for Air Force civil

engineers more efficiently than could the Government's internal supply system. Under the COCESS program, each Air Force base prepared a list of so-called "pre-priced" materials that it expected to need. The Air Force then incorporated this list of materials into the COCESS contract for that base, and the contractor was obligated to supply such items at the specified contract price. "Non-priced" materials, by contrast, were not identified prior to the contract award, due to uncertainty as to whether the particular base would need them. The private contractor would therefore negotiate price and delivery terms with suppliers of such items as the need for them arose.

In April 1988, the Department of Defense determined not to renew existing contracts for the procurement of "non-priced" materials, opting instead to bring this aspect of the COCESS program in-house. With respect to "pre-priced" materials, DOD left it up to individual Air Force base commanders to decide whether a private supply operation would be economically viable.

Plaintiffs-appellants C C Distributors, Inc. (CCD) and Whitman Distributing Co., private firms that each hold several CO-CESS contracts, sought to enjoin DOD from converting the stores from contractor to in-house operations. The district court dismissed their complaints on the ground that they lack standing or, in the alternative, that the challenged action is committed to the unreviewable discretion of the Secretary of Defense; the court accordingly held that plaintiffs' motions for preliminary injunction are moot.

We conclude that the district court erred in its analyses of both standing and reviewability. Accordingly, we reverse and remand for the district court to consider the plaintiffs' motions for preliminary injunction.

## I.  Background

The impetus for this litigation is a Decision Memorandum, issued by Assistant Secretary of the Air Force Tidal McCoy, announcing change in the COCESS program.

Although the Memorandum did not allege any wrongdoing by plaintiffs in particular, it did state that "the COCESS program has been plagued by allegations of fraud and administrative difficulties"—problems confirmed by the Air Force Acquisition Management Review Board as well as by the General Accounting Office. The GAO went so far as to recommend discontinuance of COCESS. Secretary McCoy observed that government employees normally exercise procurement discretion to assure "timely acqui[sition of] goods and services at a fair and reasonable price" but that with respect to nonpriced materials, private contractors under the COCESS program had exercised "procurement discretion normally reserved to government personnel." In order to assure the proper exercise of such discretion by private contractors, the Air Force had been required to review the price and delivery terms of each such purchasing decision.

The Secretary leveled two criticisms at this review process. First, it "imposes a substantial administrative burden on Air Force contract administrators," forcing the Government, in effect, to "pay[ ] twice to ensure that it obtains a fair and reasonable price. . . . In accepting this extra cost in the past, [it] has implicitly recognized that the exercise of procurement discretion is a government function." Second, this additional layer of review had been less than fully effective; "excessive prices may have been charged to the Air Force as the result of fraud despite the additional effort expanded [sic]."

For these reasons, the Air Force concluded that "the procurement function, i.e., the acquisition of non-priced materials, should not be performed by a contractor"; furthermore, because the Government Operated Civil Engineer Supply Stores (GOCESS) program in effect at some bases had "proven to be an efficient, timely, and cost effective means of exercising the government's procurement discretion," it would replace the COCESS program. The Secretary added that, although government employees "need not necessarily" take over the supply of pre-priced materials, it was unclear

whether such materials alone, accounting for only about 30 percent of all materials purchased, could support a private contract operation.

Accordingly, the Secretary directed that: [E]xisting COCESS contracts will not be extended. Before the expiration of these contracts, installation commanders will determine whether the requirements for pre-priced materials will support a contract operation [at their particular base]. If not, then the entire COCESS operation [at that base] should be converted to in-house performance. If [so, then] an appropriate solicitation for pre-priced ... material ... should be developed.

Thus, conversion of COCESS will apparently take place without recompetition amongst private contractors and without studies designed to compare the costs of private performance against in-house performance; the conversions that have occurred so far confirm this inference.

CCD and Whitman each filed a complaint in the district court, alleging that conversion of COCESS to an in-house operation violates, *inter alia*, the National Defense Authorization Act for Fiscal Year 1987, DOD procurement regulations, and OMB Circular A–76; they sought both declaratory and injunctive relief. At the time of suit, CCD held nine and Whitman held eighteen COCESS contracts with expiration dates ranging from December 31, 1988 to October 31, 1989.

The district court granted the Government's motion to dismiss both complaints on two independent grounds. As to standing, the court initially concluded that CCD and Whitman lacked constitutional standing in that neither firm had established "any injury-in-fact or any reasonable likelihood that [they] will ultimately get any contracts" even if "recompetitions occur and cost comparison studies are performed." The court also found that plaintiffs failed the prudential test for standing because they "were not intended beneficiaries of any Congressional action in this area...." In the alternative, the court stated: "Decisions about whether something is a commercial activity or a governmental activity or whether it [i]s feasible to perform [procurement of non-priced materials] in-house are all totally discretionary terms that do not provide any law" for the court to apply and, hence, are unreviewable.

## II. Standing

A plaintiff in federal court must "have 'standing' to challenge the action sought to be adjudicated in the lawsuit," and "[t]he term 'standing' subsumes a blend of constitutional requirements and prudential considerations." *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471, 102 S.Ct. 752, 757–58, 70 L.Ed.2d 700 (1982).

### A. *Constitutional Standing*

In order to invoke "the judicial Power" provided in Article III of the Constitution, a plaintiff must " 'show that he personally has suffered some actual or threatened *injury* as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be *traced* to the the the challenged action' and 'is likely to be *redressed* by a favorable decision.' " *Id.* at 472, 102 S.Ct. at 758–59 (citations omitted; emphases added).

■ 1. *Injury.* Plaintiffs allege generally that the Air Force's decision will have dire economic consequences for their businesses—specifically, that the decision "substantially threatens the survival" of plaintiffs as "viable business entit[ies]." For the present purpose of establishing their constitutional standing, however, plaintiffs define their injury as the "loss of the opportunity to compete for COCESS business." This theory of harm is reflected also in their prayer for an injunction against COCESS facilities' continued operation as, and further conversions to, in-house operations "unless a recompetition does not result in reasonable prices ... and in-house performance is justified by a cost comparison study performed in accordance with OMB Circular No. A–76 ...," whereby the private contractor could "compete" against the Government for the business.

The Government correctly observes that plaintiffs have no right to obtain a CO-CESS contract. This point, which would be relevant to claims of injury based upon the loss of a COCESS contract, does not settle the question of injury here. Although plaintiffs initially claimed to be injured by the loss both of COCESS contracts and of the opportunity to compete for such contracts, they no longer claim ultimate entitlement to a contract; on this appeal, they argue only the loss of a statutorily conferred opportunity to compete for a contract.

Plaintiffs' claim of injury thus tracks a claim we found sufficient to confer standing in *West Virginia Ass'n of Comm. Health Centers v. Heckler*, 734 F.2d 1570 (D.C.Cir.1984). There, a group of community health centers claimed that the Secretary of HHS had underfunded a federal block grant to West Virginia for the provision of health care to the needy. The Secretary challenged the plaintiffs' standing on the ground that "West Virginia would have complete discretion to award any additional funding it might receive to other [community health centers] within the State which are not parties to this lawsuit." *Id.* at 1574. The Secretary, in other words, advanced a redressibility challenge on the premise that the health centers' injury consisted of their inability to obtain additional funding. "In response to this line of reasoning, the health centers argue[d] that they have been injured by being denied the opportunity to compete for ... increased funding, and that to have standing they need not demonstrate that they would actually receive the additional funding." *Id.*

In *West Virginia Ass'n*, we accepted the health centers' argument, likening their injury to those found sufficient to confer standing in three other cases. First, in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977), the Supreme Court had held that an individual plaintiff had standing to challenge a local government's refusal to rezone a particular parcel of land in order to permit construction of low income housing. "[T]he individual plaintiff's injury

was the denial of an opportunity to obtain housing for which he would otherwise be qualified. Certainty of success in seeking to exploit that opportunity was not required." *West Virginia Ass'n*, 734 F.2d at 1575.

Second, in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), the Court had concluded that an applicant for admission had standing to challenge a medical school's affirmative action admissions program. Although the applicant "had been unable to prove that he would have been admitted in the absence of the program," the Court noted that he had shown injury based upon his inability to compete for all of the places in the incoming class. *Id.* at 280–81, 98 S.Ct. at 2742–44.

Finally, in our own earlier decision in *National Association of Neighborhood Health Centers, Inc. v. Mathews*, 551 F.2d 321 (D.C.Cir.1976), we had held that an organization of community health centers had standing to seek the recovery of certain funds alleged to have been improperly expended by HEW. We noted that, if the funds were not recovered, less money would be available for the organization's members, resulting in a "sharp curtailment of their opportunities for funding." *Id.* at 329.

■ Under this line of authorities, a plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit*—such as a COCESS contract—even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity. Even so, the Government responds, plaintiffs have suffered no cognizable injury, since "no procurement process was ever invoked" by the Air Force on its way to the decision to allow current COCESS contracts to expire. For want of a competition, there was no opportunity to compete, and hence no "lost opportunity to compete."

This argument, although perhaps relevant to the merits, carries no force against plaintiffs' allegation of injury. The grava-

men of plaintiffs' allegations is that the Air Force violated the law by discontinuing CO-CESS contracts for non-priced materials without first conducting recompetitions for such contracts and undertaking cost comparison studies to evaluate the merits of private contractors as against an in-house program. To note that "no procurement process was ever invoked" begs the question of whether the relevant statutes and regulations require the Air Force to undertake the recompetition and cost comparison procedures of that procurement process, *i.e.*, whether they create a conditional right to compete.

■ *2. Traceability and Redressibility.* The Government does not take issue with plaintiffs' observation that their lost opportunity to obtain COCESS contracts is directly traceable to the Air Force's decision to take such programs in-house without first conducting recompetitions and cost comparison studies. The Government, however, contends that "[t]he likelihood that [plaintiffs'] alleged injury would be redressed is speculative," and cites our opinion in *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838 (D.C.Cir. 1982).

There, the second-lowest (and losing) bidder on a government contract challenged the administration of the contract. We assumed, *arguendo,* that the disappointed bidder had sustained an injury cognizable for constitutional purposes, but we ultimately concluded that the bidder lacked prudential standing, since the regulations for administration of government contracts were "not designed to ... protect unsuccessful bidders from illegal injury to their economic interests." *Id.* at 842. We addressed the question of redressibility, nonetheless, in a dictum in the margin, stating that the disappointed bidder's interest in bidding on the reprocurement that would follow a finding that the current contract had been maladministered was "more speculative than its interests as the second lowest bidder on a particular contract award." *Id.* at 842 n. 3. We reasoned that "[a]lthough there is no guarantee that the second lowest bidder on a government contract will be awarded the contract if the low bid on the contract is rejected, there is far less likelihood that the same bidder on a new contract will be awarded the contract." *Id.*

*Gull Airborne* is inapplicable to this case for the simple reason that the disappointed bidder there framed its injury in terms of the loss of a government contract, not the loss of an opportunity to compete for such a contract. Under the former conception of injury, the court must ask, as we did in *Gull Airborne,* whether reprocurement would likely result in the bidder actually receiving the contract. That concern would have been irrelevant had the bidder framed its injury in terms of lost opportunity, because requiring the Government to conduct a reprocurement would obviously have redressed that injury.

Here, it appears that requiring the Air Force to conduct recompetitions and cost comparison studies regarding COCESS is likely to afford plaintiffs just that opportunity the loss of which constitutes their injury; given plaintiffs' demonstrated capacity to compete for and to obtain such contracts in the past, moreover, this opportunity would not be illusory. Accordingly, we conclude that plaintiffs have satisfied constitutional requirements for standing.

### B. *Prudential Standing*

■ Here we ask whether plaintiffs' interests are "arguably within the zone of interests to be protected or regulated by the statute ... in question." *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). "The essential inquiry is whether 'Congress intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law.'" *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). As the Supreme Court has made clear:

> The zone of interest test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plain-

tiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are *so marginally related to or inconsistent with* the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

*Id.* at 399–400, 107 S.Ct. at 757 (footnote omitted; emphasis added). To meet this standard, plaintiffs point to a variety of sources.

First is the National Defense Authorization Act for Fiscal Year 1987, which governs, *inter alia,* the "contracting out [of] the performance of Department of Defense supply and service functions." § 1223, 100 Stat. 3816, 3977 (1986); 10 U.S.C.A. § 2304 Note (Supp.1988). Section 1223 of the Act states:

> (a) IN GENERAL.—Except as otherwise provided by law, the Secretary of Defense *shall* procure each supply or service necessary for or beneficial to the accomplishment of the authorized functions of the Department of Defense (*other than functions which the Secretary of Defense determines must be performed by military or governmental personnel*) from a source in the private sector if such a source can provide such supply or service to the Department at a cost that is lower ... than the cost at which the Department can provide the same supply or service.
>
> (b) COST COMPARISONS.—For the purpose of determining whether to contract with a source in the private sector for the performance of any Department of Defense function on the basis of a comparison of the costs of procuring supplies or services from such a source with the costs of providing the same supplies or services by the Department of Defense, the Secretary of Defense shall ensure that all costs considered, including the costs of quality assurance, technical

monitoring of the performance of such function, liability insurance, employee retirement and disability benefits, and all other overhead costs, are realistic and fair.

*Id.* (emphases added). To bring their interest within the zone protected by the 1987 Authorization Act, plaintiffs point to the Senate Report, in which the Armed Services Committee observed that § 1223(a), which it referred to as the "mandatory contracting out provision," "will enable private industry to compete with the government · sector whenever possible...." S.Rep. No. 331, 99th Cong. 277 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin. News 6413, 6472. With respect to § 1223(b), the Committee noted that DOD had previously handicapped private contractors by adding certain overhead costs to their bids while underestimating such costs to the Government's supply system. S.Rep. No. 331 at 278, 1986 U.S.Code Cong. & Admin.News p. 6472. The Committee believed that, by requiring that cost comparisons be "realistic and fair," § 1223(b) would make DOD cost comparisons "more equal for determination of contracting out.... In addition to opening the door for more competition [in § 1223(a) ], the competitions must be conducted on an 'apples to apples' basis [pursuant to § 1223(b) ]." *Id.*

As its name suggests, the 1987 Authorization Act is intended primarily to authorize expenditures by the Department of Defense. *See id.* at 1–2 (Purposes of the Bill). Thus, the Government argues that the use of private contractors is simply a means to "promote economy and efficiency in the performance of DOD's business." Indeed, Title X of the Act, which includes § 1223, is entitled "Department of Defense Efficiency and Economy Matters." *Id.* at 274, 1986 U.S.Code Cong. & Admin.News p. 6468. The introduction to the portion of the Senate Report dealing with Title X states that its "provisions ... are designed to reduce the overhead and labor costs of the Department of Defense" and "will offer more efficiency and economy in defense matters." *Id.* In particular, the Commit-

tee noted that the "mandatory contracting out provision" of § 1223(a) "will allow for the lowest cost to be paid by DOD." *Id.* at 278.

We can hardly say that the interest of a private firm in competing for a Defense Department contract is only "marginally related" to the goal of improving efficiency when the Senate Report makes clear that the Committee intended that competition serve as one of the principal processes by which the Government may operate more efficiently. The interests of a private firm that would like to compete for a government contract may not always correspond to the Government's interest in improved efficiency, of course; the problem of fraud identified by the Air Force with respect to non-priced materials under the COCESS program underscores the possibility of a divergence between private interests and public goals. But the plaintiffs' interest in obtaining the opportunity to compete for COCESS contracts is closely related to, even if not the same as, Congress's goal of "efficiency and economy in defense matters."

Under these circumstances, it may "reasonably be assumed that Congress intended to permit the[ese plaintiffs to bring this] suit." Since plaintiffs' interest comes within the zone of interests to be furthered by § 1223 of the 1987 Authorization Act, we need not address plaintiffs' alternative arguments concerning prudential standing under the Office of Federal Procurement Policy Act of 1974 and OMB Circular A–76.

## III. REVIEWABILITY

The APA erects a "presumption of judicial review" at the behest of those adversely affected by agency action, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510–11, 18 L.Ed.2d 681 (1967), except insofar as "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2). In determining whether action has been so committed, we ask whether the applicable statutes and regulations are "drawn so that a court would have [a] meaningful standard against which to judge the agency's exercise of discretion."

*Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). To satisfy this standard, plaintiffs point to two sources of law: § 1223 of the 1987 Authorization Act, quoted at p. 152 above, and Defense Department procurement regulations, 32 C.F.R. Part 169.

### A. *The 1987 Authorization Act*

■ Although § 1223(a) does state that the Secretary of Defense "shall" procure services and supplies from a private contractor when doing so is less costly than in-house provision, that section does not apply to "functions which the Secretary of Defense determines must be performed by military or government personnel." Thus, the statute does not provide an objective standard by which a court can assess which functions must be performed by government employees; instead, it expressly leaves that decision to the Secretary's determination. *See generally Kreis v. Secretary of the Air Force*, 866 F.2d 1508, 1513 (D.C.Cir.1989) (distinguishing between existence of a condition as an objective fact and an administrator's determination of the existence of that condition).

Section 1223(a) is linguistically similar to the statutory provision authorizing the Director of Central Intelligence to terminate a CIA employee whenever he "shall *deem* such termination necessary or advisable in the interests of the United States." 50 U.S.C. § 403(c) (emphasis added). The Supreme Court found that that provision grants the Director an unreviewable discretion. *Webster v. Doe*, —— U.S. ——, 108 S.Ct. 2047, 2052, 100 L.Ed.2d 632 (1988). The Court examined the context within which the Director makes such a determination, noting that a decision to terminate a CIA employee will typically involve considerations of national security that simply are not amenable to judicial review. *Id.* The question of whether private contractors or military personnel should be responsible for making pricing and delivery decisions with respect to materials needed for the operations of the Air Force also implicates national security concerns. Although we recognize that such concerns may be

less central in the procurement context than in the area of intelligence operations, we conclude that the principles set forth in *Webster* are sufficiently broad to encompass the present situation. Accordingly, we hold that § 1223 of the 1987 Authorization Act does not provide us with a "meaningful standard against which to judge the agency's exercise of discretion."

### B. *Department of Defense Regulations*

■ Plaintiffs also claim that certain Defense Department procurement regulations provide standards suitable for judicial review. Both plaintiffs' opening brief and the Government's brief discuss a now-superceded version of the DOD regulations, however, 32 C.F.R. Part 169 (1988); as plaintiffs note in their reply brief, DOD has recently put into place a revised version of these regulations, 54 Fed.Reg. 13373 (1989), which became effective on March 10, 1989. Since plaintiffs seek only prospective relief against future COCESS conversions, we believe that only the new Part 169 regulations are relevant to the question of reviewability.

■ Contrary to the Government's assertion at oral argument, the issue of reviewability under § 1223 of the 1987 Authorization Act, discussed above, does not bear upon the issue of reviewability under the Part 169 regulations. Notwithstanding the lack of judicially manageable standards in the underlying statute, "regulations promulgated by an administrative agency in carrying out its statutory mandate can provide standards for judicial review of agency action." *Center for Auto Safety v. Dole,* 846 F.2d 1532, 1534 (D.C.Cir.1988).

Here, the Part 169 regulations state that it is DOD policy to:

(b) *Achieve Economy and Quality through Competition.* Encourage competition with the objective of enhancing quality, economy, and productivity. Whenever performance by a commercial source is permissible, a comparison of the cost of contracting and the cost of in-house performance shall be performed to determine who shall provide the best value for the Government....

(d) *Rely on the Commercial Sector.* DoD Components shall rely on commercially available sources to provide commercial products and services except when required for national defense [or] when no satisfactory commercial source is available.... DoD Components shall not consider an in-house new requirement, an expansion of an in-house requirement, conversion to in-house, or otherwise carry on any [commercial activities] to provide commercial products or services if the products or services can be procured more economically from commercial sources.

32 C.F.R. § 169.4, 54 Fed.Reg. 13375. These regulations do seem to incorporate standards susceptible to judicial review: Is a "satisfactory" commercial source "available"? Was a cost comparison done? Is the commercial source "more economical" than in-house provision?

The Government responds by confession and avoidance, noting that the Part 169 regulations by their terms "do[ ] not apply to DoD governmental functions...." 32 C.F.R. 169.2(d), 54 Fed.Reg. 13374. Indeed, the section of Part 169 cited by plaintiffs and quoted above also sets forth DOD policy to:

(c) *Retain Governmental Functions In–House.* Certain functions that are inherently governmental in nature, and intimately related to the public interest, mandate performance by DoD personnel only. These functions are not in competition with commercial sources; therefore, these functions shall be performed by DoD personnel.

32 C.F.R. § 169.4, 54 Fed.Reg. 13375. The Government therefore argues that the Part 169 regulations for reliance on the private sector are inapplicable, because the Air Force determined that making pricing decisions under the COCESS program is a "governmental function."

The Air Force did specifically conclude that the task of determining the fairness of price and delivery terms for non-priced materials is a governmental function. Plaintiffs initially claim that this characterization contravenes the Part 169 regula-

tions, which define the term "commercial activity" as one "that provides a product or service obtainable (or obtained) from a commercial source" and add that "[a] representative list of the functions performed by such [commercial] activities is provided in enclosure 3 of DoD Instruction 4100.33." 32 C.F.R. § 169.3, 54 Fed.Reg. 13374. Enclosure 3, as set out in Appendix A to 32 C.F.R. Part 169a, lists "Contractor–Operated Parts Stores and Contractor–Operated Civil Engineer Supply Stores [COCESS]" as commercial activities.

■ Contrary to plaintiff's suggestion, however, the categorization of COCESS as a commercial activity does not preclude its categorization as a governmental function as well. The definition of commercial activity (CA in the jargon of the regulation) specifies that:

A DoD CA falls into one of two categories:

(a) Contract CA. A DoD CA managed by a DoD Component, but operated with contractor personnel.

(b) In–House CA. A DoD CA operated by a DoD Component with DoD personnel.

32 C.F.R. § 169.3, 54 Fed.Reg. 13374. The overlap is apparently intentional, since the prior version of the regulation specifically provided that "[a] DoD CA is not a Government function," 32 C.F.R. § 169.3 (1988), and this statement was deleted in the new version. The upshot is that the Part 169 regulations plainly leave open the possibility that an activity may be a governmental function (such that it must be performed by government personnel) but also come within the definition of a commercial activity (depending upon the nature of the activity, not upon who does or must perform it). Hence, a commercial activity may be performed in-house if it is also a governmental function.

Plaintiffs advance as a second basis for reviewability the Part 169 definition of a "governmental function," to wit:

A function that is related so intimately to the public interest as to mandate performance by DoD personnel. These functions include those that require ei-ther the exercise of discretion in applying Government authority or the use of value judgment in making the decision for the Department of Defense.... Governmental functions normally fall into two categories:

(a) *Act of Governing*. The discretionary exercise of Government authority. Examples include criminal investigations, prosecutions, and other judicial functions; management of Government programs requiring value judgments, as in direction of the national defense; management and direction of the Armed Services; activities performed exclusively by military personnel who are subject to deployment in a combat, combat support, or combat service support role; conduct of foreign relations; selection of program priorities; direction of Federal employees; regulation of the use of space, oceans, navigable rivers, and other natural resources; management of natural resources on Federal Property; direction of intelligence and counterintelligence operations; and regulation of industry and commerce, including food and drugs.

(b) *Monetary Transactions and Entitlements*. Refers to such actions as tax collection and revenue disbursements; control of treasury accounts and the money supply, and the administration of public trusts.

32 C.F.R. § 169.3, 54 Fed.Reg. 13374. Given the extent of these examples, plaintiffs correctly observe—and Government does not directly deny—that a court would have sufficient guidance in evaluating an Air Force decision that a particular activity is a governmental function. The court would simply need to ask whether the activity in question is, in relevant respects, similar to the enumerated activities and to give appropriate deference to the agency's answer. Such review would not differ fundamentally from the "reasoning by example" typical of the process by which a common law court applies precedents to new situations. *Cf.* Edward Levi, *An Introduction to Legal Reasoning* 1 (1949).

We therefore find in the concept of a governmental function no bar to judicial review of the Air Force's decision to take procurement of non-priced materials in-house; the relevant standards for application by the reviewing court are to be found in the Part 169 regulations, 32 C.F.R. §§ 169.3 & 169.4, 54 Fed.Reg. 13374–75. We leave their application to the district court, in the first instance, to be performed on the basis of a record supplemented by the parties with the new regulations in mind.

### IV. MOTION FOR PRELIMINARY INJUNCTION

■ Plaintiffs argue that this court should pass upon their motions for a preliminary injunction rather than remand this aspect of the case to the district court. They rely upon *Independent Bankers Ass'n v. Heimann,* 613 F.2d 1164 (D.C.Cir. 1979), which appears to be the only instance in which this court has short-circuited the district court in such a matter. The plaintiffs there sought to prevent the Comptroller of the Currency from enforcing—through individual cease and desist orders—regulatory provisions designed to "prevent[ ] insiders of national banks from benefitting personally by the regular receipt of credit life insurance income sold to borrowers of such banks." *Id.* at 1166. The district court refused to entertain plaintiffs' categorical challenge to the Comptroller's enforcement program and remitted the plaintiffs to raising their claims in a particular adjudication. *Id.* On appeal, we reversed and, while acknowledging that the case could be remanded, proceeded to rule on the merits of the

parties' cross-motions for summary judgment. In *Independent Bankers,* remand was "unnecessary and ... would be unduly wasteful of judicial resources," since we had a "full record" before us and there were no disputed issues of material fact. *Id.* at 1167.

Here, by contrast, the probability of plaintiffs prevailing on the merits, a key component of the preliminary injunction calculus, turns upon interpretation of the new Part 169 regulations—a potentially critical matter on which the parties have not joined issue. In contrast to the unnecessary remand avoided in *Independent Bankers,* therefore, remand here would give the district court the benefit of the parties' arguments concerning the meaning of the new regulations and thereby facilitate the proper disposition of plaintiffs' claim.

### V. CONCLUSION

We conclude that plaintiffs have standing to challenge the Air Force's decision to convert COCESS into an in-house operation, and that DOD's Part 169 regulations provide standards for judicial review of that decision. Accordingly, we reverse the district court order dismissing the case and remand the matter for further proceedings.

*So ordered.*